## COMMONWEALTH vs. KENNETH P. PHOENIX.

Hampshire. November 8, 1990. - February 28, 1991.

Present: Liacos, C.J., Wilkins, Abrams, Lynch, & Greaney, JJ.

*Homicide. Practice, Criminal*, Preservation of evidence, Loss of evidence
by prosecution, Comment by prosecutor, Argument by prosecutor, In-
structions to jury. *Evidence*, Scientific test, Competency, Expert opin-
ion, State of mind, Motive. *Witness*, Expert, Self-incrimination.

At a criminal trial, there was no error in the admission of testimony con-
cerning a blood fingerprint that had been destroyed in the course of
scientific testing procedures reasonably employed by the Common-
wealth, where the print had been photographed in its original state and
where the record provided no basis for determining that the original
print, if available to the defendant, might have produced exculpatory
evidence or that the blood contained in the print, if combined with
blood from other stains, would have been of sufficient quantity to per-
mit experts to conduct DNA testing. [413-415]

The Commonwealth's negligent destruction of certain evidence (part of a
paper bag containing an alleged bullet hole), although material to the
defense against a murder charge, did not require that the defendant be
granted a new trial, in view of other evidence supporting the Common-
wealth's theory that the defendant had improvised a firearm silencer
using the bag. [415]

Although the loss of certain green fibers allegedly found in a paper bag,
consumed during scientific testing conducted by the Commonwealth,
deprived a criminal defendant of the opportunity to conduct his own
tests on the fibers, a new trial was not required where it appeared that
further tests, even if favorable to the defendant, would not have dis-
proved the Commonwealth's theory that the murder weapon was a fire-
arm with an improvised silencer constructed from a green fibrous mate-
rial and a paper bag. [416-417]

The judge at a murder trial was not clearly in error in admitting certain
expert testimony after determining that, in accordance with his limiting
order, the Commonwealth's expert had conducted tests on certain blood
stains in the presence of the defendant's expert; moreover, the defend-
ant's expert had sufficient opportunity to conduct his own tests had he
chosen to do so. [418-419]

At a criminal trial, the admission, by stipulation, of the results of allotype genetic testing of certain blood stains presented no substantial risk of a miscarriage of justice. [420]

At a criminal trial, the defendant's challenge to the reliability of certain scientific tests raised matters going only to the weight of the evidence, not to its admissibility. [420-421]

Evidence was properly admitted at a criminal trial in support of the Commonwealth's theory that the defendant was a disgruntled employee, whose murder of his supervisor was motivated by job dissatisfaction. [422-424]

A prosecutor's unobjected-to remarks during his opening statement and closing argument at a murder trial, suggesting that the crime was motivated by racial animosity, although inappropriate, did not have an effect so prejudicial as to warrant a new trial. [424-426]

At a murder trial, the prosecutor's references during closing argument to the defendant's lack of an alibi did not require that he be granted a new trial, in view of the judge's repeated instructions to the jury that the defendant had no obligation to produce any evidence on his own behalf. [426-428]

At a murder trial, no undue prejudice resulted from the prosecutor's unobjected-to remarks designed to explain circumstantial evidence against the defendant's coworker, who the defendant claimed had committed the crime. [428]

At a murder trial, the defendant was not prejudiced by the judge's allowing a certain witness, who the defendant claimed had committed the crime, to invoke his privilege against self-incrimination before the jury, or by the judge's instructions to the jury concerning the invocation of the privilege. [428-429]

In response to a question from the jury during their deliberations, the judge at a murder trial correctly instructed them concerning malice aforethought, and stated that they were permitted to infer malice from the use of a deadly weapon. [429-430]

On the evidence at a criminal trial, the jury could properly convict the defendant of murder in the first degree on the theory either of deliberately premeditated malice aforethought or of extreme atrocity or cruelty. [430-431]

INDICTMENT found and returned in the Superior Court Department on July 22, 1987.

The case was tried before *John F. Moriarty,* J.

*Linda J. Thompson (John M. Thompson* with her) for the defendant.

*Ariane D. Vuono,* Assistant District Attorney, for the Commonwealth.

ABRAMS, J. The defendant, Kenneth P. Phoenix, was convicted of murder in the first degree for the killing of Raymond Green. On appeal, he challenges: (1) the Commonwealth's use at trial of testimony regarding evidence that was not preserved; (2) the admission in evidence of the results of allotype genetic testing of blood; (3) the motive theory characterizing the defendant as a disgruntled employee and the Commonwealth's alleged insinuation of a racial animosity motive; (4) the prosecutor's closing argument noting the defendant's failure to present alibi evidence; (5) the judge's rulings and instructions regarding a witness's claim of his privilege against self-incrimination; (6) the judge's instructions in response to a jury question on malice aforethought; and (7) the judge's denial of a motion for a required finding of not guilty. The defendant also asks us to use our power under G. L. c. 278, § 33E, to order a new trial. We affirm the conviction.

Raymond Green was the power plant facility manager at the Belchertown State School, supervising sixty-three employees including the defendant. He worked in an office on the second floor of the powerhouse on the school grounds. On August 4, 1986, Green's secretary found him dead in his office, shot five times by a .22 caliber firearm. The police retrieved pieces of a green scouring pad from Green's face and from the floor of his office. In a metal drum on the first floor of the powerhouse, they also discovered a crumpled brown paper bag and a rolled-up piece of green scouring pad. The drum was situated next to the entrance to a tunnel system that connected the powerhouse with other school buildings. Subsequent examination of the bag revealed several blood stains, one of which contained a fingerprint belonging to the defendant. After chemical treatment, additional fingerprints appeared. Of these fingerprints, those that were identifiable also were determined to be the defendant's.

The Commonwealth's theory was that the defendant entered the powerhouse undetected through the tunnel system

and went to Green's office while Green was out getting his lunch. According to the theory, the defendant constructed a homemade silencer by wrapping a gun in a green scouring pad and placing it in a paper bag. When Green returned to his office, the defendant shot him five times at point blank range. The defendant escaped through the tunnel system, dumping the bag and the scouring pad in the metal drum on his way out. The weapon was not recovered. On June 3, 1988, a jury returned a verdict of guilty of murder in the first degree.

1. *The failure to preserve evidence.* According to testimony, the Commonwealth subjected the bag and scouring pad to various testing procedures immediately after the murder and up through the time of trial. On August 6, a State trooper delivered the bag to the Connecticut State crime laboratory (Connecticut lab), where, still in its crumpled state, forensic specialists photographed it and examined it by laser for fingerprints. The trooper then brought the bag to the Massachusetts crime laboratory (Massachusetts lab) where officials opened it up, revealing what appeared to be blood stains and a fingerprint in blood. Before applying any chemical treatment, they photographed both the bag and the fingerprint. Chemist Mark Grant then cut out a small bloodstained section of the bag adjacent to the blood fingerprint, to preserve it for testing. Another photograph was taken. Grant tested the stain and concluded it was human blood type "O."

Grant testified that he observed a small hole in the bag which he characterized as consistent with the size of a .22 caliber bullet. He tested a darkened area around the hole and found lead residue. By the time of trial, some unidentified person had taken further cuttings from the bag, including from the area surrounding the hole, so that the hole and lead residue were no longer apparent. No photographs were made of the hole.

One of Grant's colleagues then treated the bag with a collodion spray to enhance the blood print. Afterward, the trooper transported the bag back to the Connecticut lab,

where a chemist applied a ninhydrin solution. This process exposed nine additional latent prints. It also, however, washed away the print in blood.

Grant also tested the green scouring pad, and found blood residue and gunpowder particles on it. He discovered green fibers inside the bag, and examined them both under a microscope and through infrared analysis. He determined that they were similar in appearance and chemical structure to the fibers of the green scouring pad. He did not test the fibers for gunpowder or blood. The bulk of the fibers found in the bag were not offered in evidence. The Commonwealth did offer an envelope that it claimed contained a few small fibers that remained after testing. By the time the judge examined the envelope, however, even these fibers were not apparent.

The defendant contends that the Commonwealth and its agents intentionally destroyed the blood fingerprint, the alleged bullet hole in the paper bag, and the fibers allegedly found inside the bag. He argues that the judge should not have allowed the Commonwealth to present testimony relating to any of this unavailable evidence. The failure to exclude the testimony, according to the defendant, violated his right to due process, and requires a new trial.

"[W]hen potentially exculpatory evidence is lost or destroyed, a balancing test is employed to determine the appropriateness and extent of remedial action. The courts must weigh the culpability of the Commonwealth, the materiality of the evidence and the potential prejudice to the defendant." *Commonwealth* v. *Olszewski*, 401 Mass. 749, 755 (1988), quoting *Commonwealth* v. *Willie*, 400 Mass. 427, 432 (1987). See *Commonwealth* v. *Troy*, 405 Mass. 253, 261 (1989).[1] With this test in mind, we consider each piece of missing evidence in turn.

---

[1] The defendant does not specify in his brief whether his claims arise under the Federal or State Constitution. Neither party addresses the question whether the standards do or should differ. The United States Supreme Court recently held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Arizona* v. *Young-*

(a) *The blood fingerprint.* The defendant contends that the destruction of the blood fingerprint on the bag unfairly deprived him of the opportunity to conduct an independent examination and analysis of it. Considering the culpability factor first, we cannot· discern any fault on the part of the Commonwealth in the destruction of the blood fingerprint. The Commonwealth was faced with a choice of either applying the ninhydrin solution to raise latent prints (that may have been exculpatory to the defendant) or preserving the original blood print. The decision arose in the course of the police investigation before the defendant had become a suspect or could have participated in the choice. Before attempting to raise additional prints, the Commonwealth carefully photographed the blood print in its original state.[2] The chosen course of action was entirely reasonable. Cf. *Commonwealth* v. *Shipps*, 399 Mass. 820, 836 (1987) ("Any culpability of the Commonwealth [due to its use of a destructive testing procedure in the investigation stage of a crime] arises in the failure to photograph each step of the test procedure").

With respect to prejudice, the Commonwealth's two fingerprint experts based their trial testimony on the photograph of the print before it was washed away, not on the actual print itself. The defendant had ready access to the photograph and could easily have arranged to have his own

---

*blood*, 488 U.S. 51, 58 (1988). Because we deny relief under the standard articulated in our cases, which is stricter than its Federal counterpart, we do not discuss the Federal cases. Although these issues arose as evidentiary rulings without separate findings of fact from the judge, we note that the record could not support a claim of bad faith on the part of the police.

[2]The defendant asserts that the record does not affirmatively establish that the fingerprint was photographed before chemicals were applied. We do not agree. The judge held an extensive voir dire on the admissibility of. the photograph, at which three witnesses testified that the photograph was taken prior to chemical treatment. At the end of the voir dire, defense counsel conceded the photograph's admissibility. On appeal, the defendant, for the first time, contends that it is unclear from the photograph whether the fingerprint was a direct or reverse reproduction of the defendant's left index finger. This assertion is flatly contradicted by the transcript, which states that the print was a reverse reproduction.

expert analyze it. Moreover, the defendant, after an extensive voir dire, acquiesced in the admission of the photograph in evidence. The defendant could not have been prejudiced by the testimony of the Commonwealth's experts regarding evidence to which he had access. Cf. *Nally* v. *Volkswagen of Am., Inc.*, 405 Mass. 191, 197-198 (1989) (in a civil case unfair prejudice results from the use of an expert opinion based on physical evidence that the expert subsequently destroyed).

Nevertheless, the defendant now contends that access to the original print was crucial to account for certain inconsistencies between the photographed blood print and an inked print of the defendant taken later. He also argues that the fingerprint might have provided additional blood to be used in DNA testing. See part 2, *infra*. "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *Shipps, supra* at 836, quoting *United States* v. *Agurs*, 427 U.S. 97, 109-110 (1976). The defendant must establish "a 'reasonable possibility, based on concrete evidence rather than a fertile imagination,' that access to the [destroyed evidence] would have produced evidence favorable to his cause.' " *Commonwealth* v. *Neal*, 392 Mass. 1, 12 (1984), quoting *State* v. *Michener*, 25 Or. App. 523, 532 (1976). The Commonwealth's experts attributed the inconsistencies between the blood print and the inked print to the different conditions under which the prints were obtained. Both experts testified that the inconsistencies did not affect their ability to make an identification. Thus, no basis exists for a determination that there is a reasonable possibility that an examination of the original print would have produced a different explanation for the inconsistencies that would have been exculpatory. Further, the record does not support a determination that the blood contained in the fingerprint, when combined with the blood from the other stains on the bag, would have enabled experts to conduct DNA testing. Therefore, the record does not demonstrate that the original print

would have been material evidence. The testimony regarding the blood print was properly admitted.

(b) *The hole in the bag.* Unlike the blood fingerprint, the Commonwealth has offered no explanation for the destruction of the hole in the paper bag, and the hole was not preserved in a photograph. Therefore, the Commonwealth's culpability rises at least to the level of negligence and must be accounted for in the balancing procedure. See *Olszewski*, *supra* at 757 n.7.

Evidence of the alleged bullet hole was material to the defendant's case because of the Commonwealth's theory that the defendant constructed a homemade silencer. The hole could have been material evidence of how the murder weapon was used.

The loss of the hole, however, does not require a new trial. There was ample evidence aside from the hole in the bag supporting the Commonwealth's homemade silencer theory. The bag was stained with blood. The rolled-up scouring pad was found next to the bag and it tested positive for gunpowder and blood residue. Pieces of the scouring pad were found at the murder scene and on the victim's face. Although the judge would have acted within his discretion had he struck the testimony, his refusal to do so in the circumstances was not erroneous.[3] A new trial is not required.[4]

---

[3]Not until after Grant's testimony regarding the hole had been presented did the defendant object on the ground that the hole had been destroyed. During that posttestimonial objection, the defense counsel admitted that, "I came in here yesterday trying to find [the hole]. I couldn't find anything." Because counsel knew about the missing hole and did not object to the testimony beforehand, the judge's decision to allow the jury to assess the credibility of the testimony rather than strike it altogether was proper. Moreover, although the defendant may have been entitled to an instruction that the jury may draw an adverse inference from the loss of the hole, he did not request one. The judge's failure to grant one sua sponte is not reversible error.

[4]The defendant suggests that the prejudice was compounded when the judge excluded testimony from another of the Commonwealth's witnesses, Trooper Kevin Murphy, regarding the hole in the bag. Pointing to the transcript of Murphy's grand jury testimony, the defendant contends that Murphy's description of the shape of the hole would have differed from Grant's, and therefore would have impeached Grant. Murphy's grand jury

(c) *The green fibers.* As with the hole in the bag, the Commonwealth must bear some culpability for the loss of the green fibers allegedly found in the bag. Grant testified that he examined the fibers under a microscope and through infrared analysis. He also claims that 95 to 99 per cent of the fibers were "used up in the analysis," although he did not explain how or why the fibers were necessarily destroyed through this kind of examination, nor did the defendant ask him. No photographs of the fibers taken before analysis were offered in evidence. There is a dispute over how and when the leftover fibers were lost. In addition, the fibers would have been material. They would have been the only direct physical evidence that the green scouring pad was placed in the bag.

As to prejudice, the loss of the fibers deprived the defendant of the opportunity to conduct his own tests on the fibers. The defendant contends that he could have tested the fibers for blood and gunpowder residue, which the Commonwealth neglected to do. If such tests had been negative, he asserts that they would have been exculpatory because greater doubt would have been cast on the link between the bag and the pad. It does not appear from the record that the defendant requested such tests. Yet even assuming such tests were feasible and would have come out negative, the absence of blood or gunpowder would not have disproved the connection between the bag and the fibers. See *Shipps, supra* at 836-837 (although tests defendants could have run if evidence was not

---

testimony was not offered before the judge and is not properly in the record before this court. See *Commonwealth* v. *Roberts*, 407 Mass. 731, 735 n.2 (1990). Moreover, the defendant moved successfully to exclude Murphy's testimony about the hole. Therefore, he cannot now complain that the evidence was excluded. "The theory of law on which by assent a case is tried cannot be disregarded when the case comes before an appellate court for review. . . ." *Santa Maria* v. *Trotto*, 297 Mass. 442, 447 (1937), overruled on other grounds, *Desmarais* v. *Standard Accident Ins. Co.*, 331 Mass. 199 (1954). See *Commonwealth* v. *Fernette*, 398 Mass. 658, 667 (1986). Considering the matter pursuant to G. L. c. 278, § 33E, we do not believe that exclusion of the testimony created a substantial likelihood of a miscarriage of justice.

destroyed may have been material, even a favorable result
would not have proved the defendant's innocence). Indeed,
even if no mention had been made at trial of the fibers found
in the bag, there was still sufficient evidence to support the
Commonwealth's theory of a homemade silencer. See part 1
(b), *supra*. We do not think that the loss of the fibers in
these circumstances requires a new trial.

2. *The blood tests.* Before trial, the Commonwealth moved
for permission to conduct potentially destructive tests on the
blood stains on the paper bag. It proposed an absorption inhi-
bition test that detects the presence of "allotypes" — specific
genetic blood markers. The defendant opposed the motion,
arguing that the stain should instead undergo DNA testing
which was capable of producing more individually specific re-
sults than the allotype testing. At a hearing on the motion,
the Commonwealth agreed that the DNA test was prefera-
ble, but objected that the stain contained an insufficient
amount of blood to conduct the test. The judge ordered the
parties to obtain an expert opinion on which testing method
would be appropriate given the size of the sample. Pursuant
thereto, Dr. Moses Schanfield and Dr. Edward Blake submit-
ted a joint letter recommending that allotype testing be con-
ducted first, because, unlike DNA testing, it would not use
up the sample. If desired, DNA testing could be attempted
thereafter, although it was their opinion that the stains did
not contain enough blood to run a successful DNA test.

On May 11, 1988, at Dr. Schanfield's laboratory in At-
lanta, Georgia, Dr. Schanfield, Dr. Brian Wraxall (the de-
fendant's expert), and Dr. David Bing (an expert on behalf
of Paul Kendrick, an unindicted suspect) performed the ab-
sorption inhibition test on five separate stains from the paper
bag. Dr. Schanfield previously had tested known samples of
both Green's and the defendant's blood. The results of the
May 11 testing were inconclusive as to all except for the
largest of the five stains. Dr. Wraxall and Dr. Bing left at
the end of the day. On May 12 and May 17, Dr. Schanfield
retested the blood from the stains.

The judge restricted Dr. Schanfield's testimony to the tests · conducted and results read on May 11 in the presence of the defense expert. Dr. Schanfield testified on this basis that the results showed that the blood from the one interpretable stain was consistent with Green's blood and that the defendant could not have been the donor. The defendant did not call his own expert to the stand.

The defendant objects to Dr. Schanfield's testimony because (1) it allegedly was based on testing done outside the presence of the defense expert in violation of the judge's limiting order and of the defendant's due process rights; (2) the Commonwealth did not establish that allotype genetic testing has gained general acceptance by the relevant scientific community; and (3) the Commonwealth did not establish that the specific tests run by Dr. Schanfield on May 11 were reliable. We reject all three of those arguments.

(a) *The presence of the defense expert.* During a voir dire that preceded his testimony, Dr. Schanfield testified that the readings taken on May 11 were uninterpretable in their entirety. When questioned by the judge later, however, he testified that the blood from one of the five stains *was* interpretable on May 11 and that it was consistent with Green's blood and inconsistent with the defendant's. The judge, acknowledging the contradiction between these statements, ruled that Dr. Schanfield could testify as to the latter results.

The defendant contends that Dr. Schanfield's conclusion was not based exclusively on the May 11 readings because it depended on comparisons with results from tests run outside the defense expert's presence.

We will not reverse a trial judge's "preliminary decisions on the qualifications of [an expert] witness and the weight and credibility of his testimony [unless] plainly wrong. We do not substitute our judgment thereon." *Matsushita Elec. Corp.* v. *Sonus Corp.*, 362 Mass. 246, 264 (1972). In this case, Dr. Schanfield testified, albeit not consistently, that his opinion was based on the May 11 tests only. The judge's admission of this limited testimony was obviously based on his

assessment of credibility of the later testimony. His determination of credibility is not plainly wrong.

Moreover, even if the opinion *was* partially based on tests conducted before and after May 11, we do not agree that the testimony violated the defendant's right to due process. The tests conducted beforehand were of known samples of Green's and the defendant's blood, and, according to Dr. Schanfield's uncontroverted testimony, the samples were not used up in testing.[5] Therefore, Dr. Schanfield's conclusions based on a comparison of the stain on the bag with these known samples did not prejudice the defendant because he easily could have conducted his own tests on the known samples. Likewise, due process was not violated even if, contrary to the judge's findings, Dr. Schanfield's opinion relied on testing done after May 11. Dr. Schanfield testified that Dr. Wraxall left Atlanta on May 11 with approximately thirty microliters of extract from the tests, sufficient to run six additional tests, which would have been "more than enough" to confirm or refute Dr. Schanfield's findings. Despite the defendant's characterizations, this situation is not analogous to cases where the prosecution's testing destroys the evidence, leaving the defendant unable to challenge the Commonwealth's expert's findings. Cf. *Commonwealth* v. *Olszewski*, 401 Mass. 749 (1988); *Commonwealth* v. *Shipps*, 399 Mass. 820 (1987); *Commonwealth* v. *Gliniewicz*, 398 Mass. 744 (1986). Rather, this case is more like *Commonwealth* v. *Neal*, 392 Mass. 1, 8 (1984), where a defendant's statutory right to an independent blood alcohol content test satisfied the requirements of due process, even though the defendant did not avail himself of that right. There was no error in admitting this testimony.[6]

---

[5] In addition, the joint letter from Dr. Schanfield and Dr. Blake indicated that allotype testing was not destructive.

[6] The defendant also objects to Dr. Schanfield's testimony that the allotypes in Green's blood are typical of the American black population and that those in the defendant's blood are common in whites. The judge previously had excluded testimony regarding the probability that the donor of the blood stain was a black person. The defendant did not object contem-

(b) *The admissibility of allotype genetic testing evidence.* "Judicial acceptance of a scientific theory or instrument can occur only when it follows a general acceptance by the community of scientists involved." *Commonwealth* v. *Mendes,* 406 Mass. 201, 205 (1989), quoting *Commonwealth* v. *Fatalo,* 346 Mass. 266, 269 (1963). At trial, the defendant agreed that genetic allotype testing meets this standard.[7] Although stipulation to the admissibility of a scientific test is not always sufficient to justify its admission, see *Commonwealth* v. *Mendes, supra* at 212 (polygraph test results are so unreliable as to be inadmissible even over stipulation), it does reduce our standard of review to a determination whether the admission created a substantial likelihood that justice miscarried. See G. L. c. 278, § 33E.

We make no such determination in this case. Dr. Schanfield presented uncontroverted testimony that the method was generally accepted in the scientific community, and has been used in over eleven countries. He asserted that laboratories in at least eight States are using allotype testing. In addition, at least one other court has ruled that this type of testing is generally accepted in the scientific community. See *People* v. *Yorba,* 209 Cal. App. 3d 1017 (1989).

(c) *The reliability of the May 11 tests.* The defendant further argues that, even if allotype genetic testing is generally admissible, the results of this particular test were unreliable and therefore inadmissible. He contends that Dr. Schan-

---

poraneously to Dr. Schanfield's statements; therefore, we review them only to determine whether their admission created a substantial likelihood that justice miscarried. See G. L. c. 278, § 33E. The challenged testimony did not violate this ruling because it did not pertain to the probability that the donor of the blood on the bag was of a certain race, but rather to the qualities of the known blood of the defendant and of the victim.

[7] The defendant contends to this court that he did not concede the point at trial. The record, however, reveals that the judge specifically asked defense counsel: "Do I understand you are not questioning the fact that the testing of this type has general acceptance in the scientific community?" Counsel replied: "Correct."

field's failure to filter the blood extracts before testing, and various discrepancies in his readings, rendered the results unreliable.

We recently addressed the evidentiary admissibility of results obtained from DNA testing. We noted that "challenges [to admissibility] should focus on the soundness and general acceptance of the particular testing process for forensic use, and, if raised, on the proper implementation of that process in the given case. Until such questions are resolved by a judge, a jury should not be given the evidence and allowed to determine the validity and soundness of the process because evidence of this character has too great a potential for affecting a jury's judgment." *Commonwealth* v. *Curnin, ante* 218, 222 n.7 (1991). In this case, the judge held a voir dire, during which Dr. Schanfield extensively testified regarding the procedure used, its general acceptance, and its implementation in the particular case. The defendant did not present any opposing evidence, although two other independent experts had observed the process and presumably were available to him.[8]

Dr. Schanfield's own qualifications as an expert in genetic allotype testing were extensive and uncontroverted. He testified that he and the defense expert did not filter the blood extracts in this case because of the small amount of blood available from the stains on the bag. He also testified that the omission of the filtering could cause "false negatives" to appear. However, there is no evidence that this omission in fact caused these results to be unreliable. "On this evidence there was 'sufficient basis for finding, as a preliminary question of fact, that this witness was qualified to testify as an

---

[8]The defendant has sought leave to supplement the record on appeal by adding an affidavit of Dr. Wraxall concerning the May 11 testing. We deny the motion. The defendant, who knew of the witness, did not produce him at the time of trial. He suggested in arguing his motion that he did not have Dr. Wraxall testify because of the expense and because he believed Dr. Schanfield's testimony sufficiently would establish the test's unreliability. These considerations are purely ones of trial strategy and, therefore, there is no reason to permit the filing of this affidavit.

expert' and that the procedures employed were performed properly and reliably. *Commonwealth* v. *Shea*, 356 Mass. 358, 361 (1969). Therefore, the defendant's various attacks alleging infirmities in the performance of the testing or the skill or knowledge of the witness go only to the weight of the evidence, not to its admissibility. *Commonwealth* v. *Yameen*, 401 Mass. 331, 336 (1987), cert. denied, 486 U.S. 1008 (1988)." *Commonwealth* v. *Gomes*, 403 Mass. 258, 273 (1988). The defendant had the opportunity, which he fully exploited, to challenge the probative value of the test results on cross-examination. Exclusion of those results was not required.

3. *Motive evidence.* The defendant objects to the Commonwealth's suggestion at trial that the defendant's motive for committing murder was his hostility toward Green as a supervisor. In addition, the defendant contends that the Commonwealth impermissibly injected a theme of racial animosity into the trial as an additional motive theory.

In particular, the defendant contends that the judge erred in admitting two memoranda written by Green[9] on the morning of the murder. Because the defendant did not object to the admission of this evidence at trial, we review the issue pursuant to G. L. c. 278, § 33E, only to determine if there was a substantial likelihood of a miscarriage of justice. Both memoranda were addressed to Henry Boston, the chief engineer who directly supervised the defendant. The first discussed a range of directives that Boston was to implement, including a policy discontinuing compensatory time and another requiring five days' notice for vacation requests. In addition, the memorandum stated: "No Power Plant Personnel, including Ken Phoenix is authorized to make runs for parts or supplies." The other memorandum assigned to the defendant the task of "marking . . . all Fire Extinguishers, Shut-off

---

[9]The defendant attempts to cast doubt on whether Green was the author of the memoranda. Although the testimony of the secretary who typed them is not absolutely clear, it does indicate that Green either dictated them to her or told her what he wanted them to say, leaving her to compose them. In either case, the statements are attributable to Green.

Valves and Emergency Shut-off Stations" by October 1, 1986. The defendant contends that these writings are hearsay. The Commonwealth asserts that they are admissible to show the victim's state of mind.

The state of mind exception to the hearsay rule "admits relevant evidence of the victim's state of mind of which the defendant was aware. . . . Such a statement is not admissible in evidence unless the trier of fact is warranted in finding that the defendant had been aware of the victim's state of mind." (Citations omitted.) *Commonwealth v. Zagranski*, 408 Mass. 278, 282-283 (1990). There was sufficient evidence for the jury to infer that the defendant was made aware of the contents of the memoranda. The secretary said that Green normally distributed memoranda to Henry Boston himself, and that Boston had been "in and out" of the office during the morning. There also was testimony that the defendant was seen with Boston that morning and had run an errand for him.

The defendant also raises for the first time on appeal an objection to testimony from a coworker of the defendant, John Harris, who claimed to have overheard the defendant say that he hated Green. The defendant asserts that the statement is inadmissible because there was no showing that the defendant continued to harbor such feelings at the time of the murder. There was no error. Although Harris could not recall exactly when the defendant made the statement, Green had worked at the school for only four months prior to the murder. Even if the defendant had made the statement at the beginning of Green's tenure, it would not be so remote as to be inadmissible as a matter of law. "The question of remoteness is largely within the sound discretion of the trial judge, and there is nothing to indicate an abuse of discretion in this regard." (Citations omitted.) *Commonwealth v. Travis*, 408 Mass. 1, 15 (1990). Moreover, defense counsel exploited Harris's inability to remember the time of the statement during cross-examination and in his summation.

In addition, the defendant contends that testimony of various witnesses regarding the strict working environment cre-

ated by Green was irrelevant and prejudicial because it did not relate directly to the defendant. We disagree. The Commonwealth introduced testimony to demonstrate that Green's management style was more demanding than his predecessor's. That evidence could support the inference that Green was stricter with the defendant as well. Combined with the evidence of the defendant's feelings toward Green, and the memoranda which plausibly could be read to make the defendant's job less desirable, the testimony could support the Commonwealth's theory that the murder was motivated by the defendant's job dissatisfaction. "Determination of the weight of [motive] evidence is for the jury, and evidence which merely suggests rather than 'clearly shows' a motive for the crime may still be ruled admissible. There is no requirement that evidence be conclusive in order to be admissible." *Commonwealth* v. *St. Germain*, 381 Mass. 256, 271 (1980).

With regard to the alleged racial animosity motive, we note that the Commonwealth never directly argued to the jury that such was the defendant's motive. The prosecutor[10] did, however, make statements in both his opening and closing arguments which unnecessarily suggested a racial theme.[11] The statements are set forth in the margin.[12] Given that the Commonwealth had no evidence that racial pre-

---

[10]The assistant district attorney who argued the appeal before this court was not trial counsel.

[11]The defendant objected to the statement in the opening but not the closing argument. In addition, prior to trial he moved to exclude evidence of racial animosity. The judge ruled that no mention of the issue was to be made in the opening statement.

[12]In his opening statement, the prosecutor stated that, when Green took over as facility manager, he "didn't have an easy task in front of him. He was a black supervisor, supervising some sixty-three all white employees . . . ." In closing argument the prosecutor, commenting on Harris's testimony regarding the defendant's professed hatred for Green, told the jury, "You heard that from another black man, and you might say, well, this is another black man and perhaps he's sticking up for Ray Green. He didn't come forward before, but why didn't he? Is it possible because he is a black man and still working at Belchertown State School that he didn't

judice played a role in the murder, these racial references were irrelevant and potentially prejudicial. It was improper for the prosecutor to invite the jury to impute racial animosity into a situation without evidence to support it. "Appeals to racial, religious, or ethnic prejudices are especially incompatible with the concept of a fair trial because of the likelihood that such references will 'sweep jurors beyond a fair and calm consideration of the evidence.'" *Commonwealth v. Mahdi*, 388 Mass. 679, 693 (1983), quoting *Commonwealth v. Graziano*, 368 Mass. 325, 332 (1975). "It cannot be said too often that care must be taken not to exploit, even inferentially, latent racial paranoia." *Commonwealth v. Washington*, 28 Mass. App. Ct. 271, 276 (1990) (Brown, J., concurring).

Nevertheless, we do not believe a new trial is required. The defendant did not object to the remark in the closing argument. "The absence of objection by defense counsel during or after argument may provide some guidance as to whether a particular argument was prejudicial in the circumstances." *Commonwealth v. Kozec*, 399 Mass. 514, 518 n.8 (1987). This is especially true where, as here, contemporaneous objections were made to the prosecutor's summation.

The judge, after a colloquy with the defendant, individually screened each juror for potential prejudice, which helped to protect the defendant against a biased verdict. See *Commonwealth v. Washington*, *supra* at 275. Moreover, "we must attribute a certain sophistication to the jury as aided by the cautionary remarks of the judge." *Commonwealth v. Johnson*, 372 Mass. 185, 197 (1977). See *Kozec*, *supra* at 517. The judge here repeatedly emphasized that the opening and closing arguments were not evidence, and if statements made in the arguments were not borne out by the evidence, the jurors were to ignore them. No evidence in front of the jury supported the prosecutor's suggestions. Harris testified that when he confronted the defendant with his remark

come forward? Use your common sense and life experiences. Might you be hesitant to come forward with information?"

about Green, the defendant said that he did not have anything against black people, he just did not like Green. In these circumstances, although the prosecutor's remarks in this case were inappropriate, we do not believe that their effect was so prejudicial as to warrant a new trial.

4. *Closing argument.* The defendant objected to references in the prosecutor's closing argument to the defendant's lack of an alibi. He also contends that the prosecutor improperly suggested to the jury that the defendant acted in concert with Henry Boston even though no joint venture evidence was introduced. "In analyzing a claim of improper argument, the prosecutor's remarks must be viewed in light of the 'entire argument, as well as in light of the judge's instruction to the jury and the evidence at trial.'" *Commonwealth* v. *Lamrini*, 392 Mass. 427, 432 (1984), quoting *Commonwealth* v. *Bourgeois*, 391 Mass. 869, 885 (1984).

The defendant points to four separate passages in the Commonwealth's closing argument that he claims unfairly emphasized his exercise of his right not to testify. Two of those passages were not erroneous. In the first, the prosecutor queried: "Do we know, does anybody ever know, where Kenneth Phoenix is? He works alone." In context, the thrust of these comments were directed to the defendant's opportunity to commit the murder. Cf. *Commonwealth* v. *Preziosi*, 399 Mass. 748, 753 (1987) ("The prosecutor's comments were within the proper realm of suggesting opposing inferences which could be drawn from the evidence"). Likewise, when the prosecutor stated that "[t]here's no evidence" that the defendant handled the paper bag after the murder, he merely was contrasting the strength of the Commonwealth's case against the reasonableness of contradictory inferences. See *Commonwealth* v. *Feroli*, 407 Mass. 405, 409 (1990).

The two other challenged passages are more problematic. In the first, the prosecutor, after again commenting on the fact that the defendant worked alone, asked: "Does he have an alibi? Does anybody know where he was? Well, I would suggest, we all know where he was, ladies and gentlemen. He was coming through that tunnel in the powerhouse, and he

went up to Ray Green's office and murdered him." Later, listing the inculpatory evidence before the jury, the prosecutor included "the access to the victim at the time, without the alibi."

The defendant clearly does not have the burden of proving an alibi. See *Commonwealth* v. *Berth*, 385 Mass. 784, 789 (1982). The prosecutor's remarks were "reasonably susceptible of being interpreted as a comment on [the defendant's] failure to take the stand." *Commonwealth* v. *Smith*, 387 Mass. 900, 908 (1983), quoting *Commonwealth* v. *Domanski*, 332 Mass. 66, 69 (1954). The Commonwealth admits that "the prosecutor could have chosen his words more carefully."

We do not believe, however, that the error requires us to order a new trial, because the judge's instructions "were sufficiently clear and complete to negate any possible prejudice to the defendant." *Commonwealth* v. *Ferreira*, 381 Mass. 306, 316 (1980). In his charge to the jury, the judge instructed "as strongly as I possibly can that you may not and you must not draw any inference against the defendant" from his failure to take the stand. The defendant objected that the judge did not instruct that the defendant did not have to prove an alibi. The judge thereafter reiterated to the jury that the defendant had "no obligation to produce any evidence on his own behalf." The defendant did not renew his objection. He now claims that the instructions were not specific enough to cure the defects in the closing argument.

Although the judge did not use the word "alibi" in his instructions, he clearly told the jury both that the defendant need not produce evidence on his own behalf, and that the jury could not draw an inference against the defendant for not testifying. A judge is "not required . . . to instruct the jury in the exact language requested by the defendant." *Commonwealth* v. *Matchett*, 386 Mass. 492, 498 n.8 (1982). The fact that the defendant did not take exception to the additional instructions given in response to his earlier objection reassures us that the contemporaneous instruction was

satisfactory to defense counsel. There is no cause for reversal on these grounds.

The defendant also complains that there was no evidence to support the suggestion in the closing argument that the defendant acted in consort with Henry Boston, the chief engineer. We disagree with the defendant that the prosecutor "suggest[ed] that Henry Boston set Paul Kendrick up as a suspect to divert suspicion from Ken Phoenix." The defendant relied heavily on a claim of mistaken identity, arguing that Kendrick rather than the defendant committed the murder. Consequently, the prosecutor spent a significant portion of his closing argument offering explanations for circumstantial evidence pointing to Kendrick. The challenged remarks[13] were designed to provide an innocent explanation for Kendrick's presence in the powerhouse shortly before the murder. Moreover, although after closing argument the defendant objected to numerous other statements allegedly not supported by the evidence and not argued on appeal, he did not object to these particular remarks. The failure to object not only reduces our standard of review to whether there was a substantial likelihood that justice miscarried, it also confirms our conclusion that no undue prejudice resulted from these remarks. We remind prosecutors again that "[a]dvance preparation would eliminate from our consideration most aspects of closing arguments constantly being urged as improper." *Smith, supra* at 903, quoting *Commonwealth v. Haas*, 373 Mass. 545, 557 (1977).

5. *Kendrick's claim of privilege before the jury.* The defendant objects, also for the first time on appeal, to the judge's allowance of Kendrick's invocation of his privilege against self-incrimination before the jury, and to the corre-

---

[13]The challenged portion of the closing argument is as follows: "Mr. Kendricks [sic], you heard, went into that powerhouse. Did he volunteer, or was he sent in by Mr. Barston [sic], the supervisor of all the people in the powerhouse, the friend of Mr. Phoenix? The same person who had every individual, out of that powerhouse at the time of the murder . . . .

"Not only that, you heard how, when Mr. Kendricks [sic] was sent up for that tool, it was during a period of time when the murder occurred."

sponding jury instructions. Although it may have been improper for the judge to permit Kendrick to claim the privilege in front of the jury, see *Commonwealth v. Gagnon*, 408 Mass. 185, 198 (1990), the ruling certainly did not prejudice the defendant. Hence, experienced trial counsel did not object. "It has long been recognized that jurors tend to view a witness' invocation of the privilege as a 'clear confession of a crime.' *State* v. *Corroles*, 138 Ariz. 583, 590 (1983), quoting 8 J. Wigmore, Evidence § 2272 at 426 (McNaughton rev. ed. 1961)." *Id.* at 197. Because the defendant's theory was that Kendrick, not he, was guilty of the crime, it is disingenuous of him now to argue that the ruling was error, even if the ruling was on the judge's initiative rather than his own.

The defendant further contends that the judge's instructions regarding Kendrick's privilege aggravated the prejudice resulting from the Commonwealth's reference to the defendant's lack of an alibi. See part 4, *supra*. There was no error in the judge's instructions. He correctly charged on Kendrick's right against self-incrimination, and the juxtaposition of that instruction with an explanation of the defendant's right not to take the stand did not render either instruction erroneous. Although the judge may have made an inadvertent or erroneous reference to Kendrick when explaining the defendant's right to remain silent,[14] the instruction nonetheless was correct. There is no basis for ordering a new trial.

6. *The malice aforethought instructions.* The defendant also argues that the judge's response to a question from the jury unduly influenced the deliberations. Although he did not contemporaneously object to the instructions, he urges us to order a new trial under our G. L. c. 278, § 33E, powers. We decline to do so.

The jury's question was, "If we find the defendant killed Mr. Green but without malice aforethought, what must our verdict be?" After discussion between the judge and counsel, the judge reiterated the elements of murder and correctly de-

---

[14]The judge stated that "[i]t is the absolute right of every one of us — you, me and Mr. Kendrick" — not to take the stand.

fined malice aforethought for the jury. He stated that an unlawful killing without malice aforethought is manslaughter, and, because there was no evidence to warrant a manslaughter finding, if the jury did not find malice it would have to render a not guilty verdict. At the Commonwealth's request, the judge instructed the jury for the first time that malice could be inferred by the use of a deadly weapon, and stressed again that the Commonwealth bore the burden of proof beyond a reasonable doubt.

We can discern no substantial likelihood that these instructions resulted in a miscarriage of justice. The instructions legally were correct. They did not place undue emphasis on the possibility of inferring malice from the use of a deadly weapon. Indeed, the judge went out of his way to stress that the inference is permitted but not required. Moreover, the defendant's failure to object indicates that the instructions were not prejudicial. See *Commonwealth* v. *Doucette*, 391 Mass. 443, 450 (1984).

7. *Motion for required finding of not guilty.* At the close of the Commonwealth's case and at the close of all evidence, the defendant moved for a required finding of not guilty pursuant to Mass. R. Crim. P. 25 (a), 378 Mass. 896 (1979). The judge denied both motions. The defendant appeals those rulings.

"On review, 'we determine whether the evidence offered by the Commonwealth, together with reasonable inferences therefrom, when viewed in its light most favorable to the Commonwealth, was sufficient to persuade a rational jury beyond a reasonable doubt of the existence of every element of the crime charged.'" *Commonwealth* v. *Mandile*, 403 Mass. 93, 94 (1988), quoting *Commonwealth* v. *Campbell*, 378 Mass. 680, 686 (1979). Although the case at bar was proved by circumstantial evidence, such evidence is competent to establish guilt. See *Commonwealth* v. *Anderson*, 396 Mass. 306, 311 (1985).

Considered in the light most favorable to the Commonwealth, the evidence showed that the defendant had the opportunity to commit the murder because he worked alone

and it would not necessarily be noticed if he were missing. He might have been able to gain access to Green's office through the tunnel system. The murder was premeditated because the culprit lay in wait for Green in his office; it was committed with extreme atrocity or cruelty because five shots were fired, the last three at Green's head from close range. The physical evidence — the bag imprinted with the defendant's fingerprint in blood which could have been Green's, found in a drum in the powerhouse next to a scouring pad marked with blood residue and gunpowder, as well as the scouring pad fragments retrieved from the scene of the murder[15] — is sufficient to permit jurors to conclude that the defendant committed the murder.[16] See *Commonwealth* v. *Loftis*, 361 Mass. 545, 551 (1972) (upholding a denial of a directed verdict where the conviction was based solely on fingerprint evidence even though that evidence was consistent with a finding that the defendant was legitimately in the victim's home on the day of the murder, as well as illegitimately there). "A jury may find a crime proved beyond a reasonable doubt even though the inference of guilt from the facts established is not inescapable or necessary." *Id.*, quoting *Commonwealth* v. *Ehrlich*, 308 Mass. 498, 500 (1941).

---

[15]The evidence recited is sufficient even without consideration of testimony regarding the hole in the bag or the fibers found in the bag. See part 1 (b) and (c), *supra*.

[16]The defendant argues at length that the Commonwealth did not prove beyond a reasonable doubt its "blowback" theory — that the firing of the gun while it was in contact with the defendant's head caused blood to splatter back toward the gun onto the bag. He also contends that the Commonwealth did not prove that the blood would have dried within any particular period of time, presumably therefore not showing that the defendant's fingerprint was imprinted on the bag necessarily during the commission of the murder. See *Commonwealth* v. *LaCorte*, 373 Mass. 700, 703 (1977) (fingerprint evidence will support a conviction when established that they could have been impressed only during the commission of the murder). Neither of these findings was required to establish the defendant's guilt. The Commonwealth need not prove that Green's blood came to be on the bag in any particular manner; an inference that the blood was in some way connected with the murder is reasonable.

8. *General Laws c. 278, § 33E.* We have reviewed the entire case pursuant to G. L. c. 278, § 33E, and are satisfied that justice does not require us to grant relief.[17]

*Judgment affirmed.*

[17]We note that the defendant's appellate counsel unnecessarily added to the expense of this appeal. The record appendix includes reproductions of over 200 pages of transcript already a part of the record. The appendix also incorrectly includes portions of the grand jury transcripts, which are not part of the proceedings unless a specific issue concerning grand jury proceedings is raised prior to trial and specifically requested to be included. Under the guise of asking for separate relief pursuant to G. L. c. 278, § 33E, the brief repeats wholesale arguments already thoroughly discussed. Moreover, counsel's arguments were, in some cases, based on blatant mischaracterizations of the record. See, e.g., note 2, *supra*; note 7, *supra*.