COMMONWEALTH *vs.* RICHARD ADAMS.

Norfolk. April 6, 2001. - August 14, 2001.

Present: MARSHALL, C.J., SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Insanity. Practice, Criminal,* Fair trial, Assistance of counsel, Argument by prosecutor, Capital case. *Evidence,* Inference, Relevancy and materiality, Prior misconduct.

This court concluded that, while the admission of evidence that a criminal defendant acted consistently with his attorney's advice and refused to answer postarrest police questions would ordinarily point to harmful error and reversal of the defendant's convictions of murder, it would decline to reverse in this case, where the evidence was not objected to and was initially introduced by the defendant as part of a defense trial strategy on the question of sanity, and where the weight of other evidence of sanity was substantial; further, in these circumstances, this court did not find that there was a substantial likelihood of a miscarriage of justice. [811-815]

At a murder trial, the prosecutor did not improperly elicit evidence of the defendant's request for counsel at a police station after his arrest, where, consistent with its apparent trial strategy, the defense was the first to raise the defendant's telephone conversations with counsel at the police station in a substantive way. [815-816]

The record at the trial of a murder case did not support the defendant's contention that the prosecution elicited evidence that was intended to inflame racial and ethnic prejudices, where the subjects of the defendant's race and his religion were relevant to the issues at trial, where the judge conducted an intensive and meticulous four-day jury selection process intended to identify possible racial and religious prejudices held by potential jurors, and where the defense did not object to the evidence at trial. [816-820]

At a murder trial, the judge did not abuse his discretion in admitting evidence of the defendant's prior bad acts, where the evidence became relevant when a defense expert testified about the defendant's sanity, thus making the evidence particularly relevant to the defendant's mental state during the time period when he committed the crimes. [820-822]

At a murder trial, the prosecutor did not engage in improper argument when exhorting the jury to "do its job" by returning a guilty verdict where, as framed by the prosecutor in this case, the reference to "job" did not contain the suggestion of duty to convict that this court has found unacceptable in other instances. [822]

INDICTMENTS found and returned in the Superior Court Department on December 19, 1996.

The cases were tried before *Julian T. Houston*, J.

*James L. Sultan* (*Catherine J. Hinton* with him) for the defendant.

*Varsha Kukafka*, Assistant District Attorney, for the Commonwealth.

CORDY, J. In the early evening of July 18, 1996, Richard Adams[1] brutally murdered his mother-in-law at her home in Foxborough, by stabbing her repeatedly in the chest and abdomen and striking her in the head with a blunt instrument. Shortly thereafter, Adams killed his father-in-law as he returned from work and was about to enter the home, striking him fourteen times in the head and neck with a hammer. Adams then set fire to the house and left for the Mansfield train station to pick up his wife. On the way he dialed 911 and reported that there had been an altercation and injuries at the home. Later that evening, he voluntarily surrendered to the police at the Mansfield train station.

At trial, Adams relied on a defense of lack of criminal responsibility[2] based on a claim that he was delusional and believed his in-laws were about to kill him. He was convicted on one indictment charging arson and two indictments charging murder in the first degree by deliberate premeditation and extreme atrocity or cruelty. Adams appeals from his convictions, claiming that the prosecution violated his rights under the Massachusetts and Federal Constitutions by using his postarrest silence as evidence to rebut his insanity defense, and denied him a fair trial by improperly attacking his character and appealing to racial and ethnic prejudices to inflame the jury against him. He also claims that the trial judge erred in admitting in evidence his prior acts of violence or threatened violence against his wife that occurred in the months leading up to the killings, and that it was improper for the prosecutor to suggest in his

---

[1] The defendant's legal name is now Iknaton Rhajik Iksmala Nzaddi. As is our custom we recite the defendant's name as it first appears on the indictments. See *Commonwealth* v. *Rodriquez*, 423 Mass. 449, 449 n.1 (1996).

[2] "A person is not responsible for criminal conduct if at time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of the law." *Commonwealth* v. *McHoul*, 352 Mass. 544, 546-547 (1967).

closing argument that it was the jury's "job" to convict him. Finally, Adams asks the court to use its power under G. L. c. 278, § 33E, to reverse the convictions and order a new trial based on the over-all conduct of the prosecution during the trial of the case that he alleges "shock[ed] the conscience."

We affirm the convictions. Adams's objection on appeal to the admission in evidence of his postarrest silence is inconsistent with the strategy he employed at trial, a strategy executed by experienced defense counsel in a case of unique and extraordinary facts. His contention that the prosecution elicited evidence intended to inflame racial and ethnic prejudices is overstated and not borne out by the record. The admission in evidence of his violent conduct in the months preceding the murders was not error as it was relevant to his state of mind and had been considered by experts for both parties in forming their opinions about Adams's criminal responsibility. The prosecutor's closing argument as fully reflected in the record of the trial was not error. We decline to exercise our power under G. L. c. 278, § 33E, to reverse or reduce the verdicts in this case.

1. *Facts.*

We recite the facts in the light most favorable to the Commonwealth, reserving certain details for discussion in conjunction with the issues raised. See *Commonwealth* v. *Fowler*, 431 Mass. 30, 31 (2000).

Adams, an African-American man, met Jennifer Levesque, the victims' daughter, in Vermont in 1988 while he was attending Norwich University and she was attending St. Michael's College. Levesque is white. They were married in Vermont in 1994. Adams converted to Islam sometime that same year and legally changed his name to Iknaton Rhajik Iksmala Nzaddi. In January, 1996, Levesque gave birth to a daughter. On February 14, 1996, one month after the birth, Adams suffered a leg injury in a late-night hit-and-run accident as he crossed a street in Vermont. He became convinced that this was not an accident and that he had been targeted by the driver. After the accident, the relationship between Adams and his wife deteriorated further to the point where she prepared to leave with their child and move back to Massachusetts. On learning this, Adams became enraged and destroyed their apartment in an incident on March

1, 1996, which culminated in his putting a knife to his wife's throat. This altercation was interrupted by a friend who, at Levesque's request, drove her and her child to get their car (which was in the repair shop) so that Levesque could leave Adams and Vermont immediately.

Levesque and her daughter moved into her parents' home in Foxborough. Thereafter, Adams became increasingly depressed and paranoid about people watching him or coming after him. He was unemployed, began to drink more heavily, and became convinced that his in-laws were trying to break up his marriage because of his race. Because he was determined not to let that happen, on Father's Day weekend in June, 1996, Adams travelled to the Levesque family home and moved in.

The morning of July 18, 1996, began as other weekdays had begun since Adams had moved into his in-laws' home. Mr. and Mrs. Levesque went to work, Adams dropped his daughter off at a day care center, and took his wife to the Mansfield train station where she boarded a train to Boston for work. Adams returned to the home, watched pay per-view movies and apparently drank alcohol for the rest of the day. Late in the afternoon, Adams called the day care center and told them he would have to pick his daughter up later in the day. When his mother-in-law returned home from work (apparently earlier than anticipated), Adams was still home. There was some interaction between them which caused Adams to go up to her bedroom to speak to her. He was carrying a kitchen knife in his back pocket with a plastic bag wrapped around the handle. Adams claims (in statements made to his expert psychiatric witness) that he entered the room as she was hanging up the telephone and that when she turned and looked at him, he knew she was going to kill him; he therefore repeatedly stabbed and beat her to death.

After killing Mrs. Levesque, Adams prepared to set the home on fire. He poured gasoline on the stairs and assembled piles of flammable material to be burned along a trail leading from the living room up to the bedroom. He positioned a fan to blow the flames up the stairs, and prepared to start the fire or set off an explosion by using the gas stove in the kitchen.

After preparing the house to be burned, he went outside to

wait for Mr. Levesque.[3] At 7:06 P.M., while Adams waited, he telephoned Christopher Micciche, a Vermont attorney whom he had hired to represent him in the civil case arising out of the hit-and-run accident. They discussed the case, and Adams became upset when Micciche told him that he would have to return to Vermont to testify. Micciche tried to calm him down by changing subjects and asking him about life with his in-laws. He stated that they were "fucking with [his] mind" and "ruining his life." Just then, Mr. Levesque pulled into the driveway. Adams asked Micciche to speak to Mr. Levesque, which he did, awkwardly, for several minutes. Adams got back on the telephone and said, "see what I mean."

Adams then stopped talking, and Micciche heard grunts, groans, bumps, and heavy breathing. When Adams returned to the telephone, he was screaming, sobbing hysterically, and incoherent. He told Micciche that he had just beat his father-in-law with a sledge hammer. After trying to ascertain whether this was true and whether someone was injured, Micciche repeatedly told Adams to dial 911 and advised him that when the police responded to the call, he was not to answer any of their questions. Adams drove away from the scene and headed to the Mansfield train station. The house was on fire.

At approximately 7:30 P.M., Foxborough police officers arrived at the Levesque home in response to a report of a fire. The police went inside through a side door to an enclosed porch where they discovered Mr. Levesque's body bleeding from the head. In the kitchen, one of the stove's burners was lit and the other burners were in the "on" position with gas spewing from them. Shortly thereafter, the Foxborough fire department arrived and fire fighters forced their way into the main residence, where they observed a series of fires on the living room floor leading to the stairway to the second floor. Mrs. Levesque was found dead in the master bedroom on the second floor where most of the fire was concentrated.

Shortly after 7:30 P.M., the Foxborough police received a telephone call from the State police indicating that they had received a 911 telephone call (apparently from Adams) about a

---

[3]It is not certain from the evidence precisely when Adams actually lighted the fire. It was either just before or just after he killed Mr. Levesque.

fire at the Foxborough address and about a "serious altercation" that had taken place there. The caller had identified himself and mentioned blood, and that he was en route to the Mansfield train station. Foxborough and Mansfield police officers went to the train station to locate the caller. When they arrived, Adams was sitting in a red Nissan automobile with the door ajar and speaking on a cellular telephone. He yelled, "Hey officers." As they approached the car, Adams stepped out of it. He was distraught, covered in blood, and talking into his cellular telephone stating that he had "screwed up" and "had to do it. They were ruining my life." Adams was placed in handcuffs and taken to the Mansfield police station where he was read his Miranda rights, booked, and initially placed in protective custody. He had a strong odor of alcohol on his breath.

Adams was not cooperative during the booking process. He refused to answer the normal booking questions, and the booking officer was able to obtain Adams's identity only through identification found on his person. Eventually, the officers assisted Adams in placing three telephone calls, including one to Attorney Micciche. Micciche spoke to Detective Sergeant Robert Martin and requested that the police not question Adams. Martin told Micciche that he would have to get that directive from Adams himself. Martin then handed the telephone over to Adams so that the attorney could advise him. Adams then confirmed to Martin that he would not answer any police questions, including further booking questions.

Trooper Brian L. Howe of the State police arrived at the Mansfield police station shortly after 9 P.M. He was told by Mansfield police that Adams had been booked and informed of his Miranda rights. Howe identified himself and asked Adams if he wished to speak with him. Adams stated that he wanted medical attention. When Howe asked what kind of problem he needed help with, Adams replied that his knee hurt because he had been involved in a hit-and-run accident. Over the next fifteen minutes, Howe asked Adams several additional times

whether he wanted to speak to him about the incident, but each time Adams simply responded that he wanted medical attention.[4]

2. *Analysis.*

*Postarrest silence.* Adams claims that the prosecution improperly introduced his postarrest silence as evidence of sanity, thus depriving him of a fair trial. Defense counsel did not object to this evidence at trial, and therefore we review its use to determine whether it created a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Fowler,* 431 Mass. 30, 42 & n.20 (2000).

Evidence of postarrest silence used for the substantive purpose of permitting an inference of guilt or to impeach an exculpatory story violates the due process clause of the Fourteenth Amendment to the United States Constitution. *Doyle* v. *Ohio,* 426 U.S. 610, 619 (1976). This principle includes the use of such evidence to infer sanity in cases where criminal responsibility is at issue. *Commonwealth* v. *Mahdi,* 388 Mass. 679, 695 (1983) (no difference in use of evidence to infer sanity and its use to infer guilt or for impeachment purposes). See *Wainwright* v. *Greenfield,* 474 U.S. 284, 295 (1986) (prosecutor's use of defendant's postarrest, post-Miranda silence as evidence of sanity breaches promise that silence will carry no penalty). Similarly, evidence of a defendant's postarrest decision to request an attorney may not be used to draw an inference of guilt. *Commonwealth* v. *DePace,* 433 Mass. 379, 383 (2001), and cases cited.

There is no question that evidence of Adams's postarrest conduct, including his refusal to answer booking questions and to discuss the incident, his discussions with counsel about asserting his right not to answer questions, and his requests for medical treatment, was introduced at trial and used by both parties and their experts on the question of sanity. In ordinary circumstances, it would be impermissible for this evidence to have been admitted or used in any respect by the Com-

---

[4]Howe's questioning of Adams was improper in light of Adams's previous assertion (made to the Mansfield police) of his right to remain silent. This issue was not raised by Adams in a motion to suppress, undoubtedly because nothing incriminating was said in response to Howe's efforts to question him.

monwealth as evidence of guilt. But this is not a case of ordinary circumstances.

There are five factors we must consider when determining the effect of an error of this type, including (1) the relationship between the evidence and the premise of the defense; (2) who introduced the issue at trial; (3) the weight or quantum of evidence of guilt; (4) the frequency of the reference; and (5) the availability or effect of curative instructions. *Commonwealth* v. *Mahdi, supra* at 696-697. These factors are not exclusive or exhaustive, *id.* at 697, nor are they necessarily to be accorded equal weight. See *id.* at 698.

Applying these factors to the particulars of this case, we can readily conclude that the evidence of Adams's postarrest silence (or rather the evidence that he was able to follow his attorney's instructions not to answer police questions) was directly used by the prosecution to rebut the defense that Adams was delusional at the time he committed the murders, thereby establishing a direct relationship between the evidence and the premise of the defense (factor one)[5]; the evidence was referenced a number of times in the testimony of police witnesses, of the defense witness Micciche, and of the psychiatric experts for each side (factor four)[6]; and curative instructions were neither requested of nor given by the judge (factor five), a fact consistent with the evidence coming in without objection. Of more importance to our ultimate determination in this case is

[5]The most damaging use of the evidence took place during the prosecutor's examination of the expert witnesses for both sides. For example, the prosecutor asked the defense expert whether it was appropriate to "take this leap . . . that if a person hears something [counsel's advice not to answer questions] and then . . . acted in conformity with that directive [did not answer questions], that they understand the directive?" In addition, the prosecutor asked the Commonwealth's expert to describe what she observed about Adams on the videotape of his postarrest interview with Howe, to which she testified that, other than seeking medication for his knee, "[h]e didn't make any statements about anyone being after him, [*sic*] any difficulty, his speech was organized, his thoughts were organized." She went on to testify that she factored these observations into her evaluation of whether Adams suffered from a delusional disorder and determined that they provided no evidence of a mental disease or defect.

[6]However, we note that the prosecutor's closing argument made no reference to Adams's postarrest silence.

the analysis of the remaining two factors, i.e., who introduced the evidence, and the weight or quantum of evidence of guilt.[7]

It was defense counsel early on in the trial who elicited evidence that Adams did not answer police questioning after his arrest, consulted with counsel on this very subject on the telephone at the police station, knowingly within the hearing of police officers, was advised not to answer any police questions, and largely complied with counsel's advice in spite of State police efforts to question him. After these subjects were introduced by defense questioning, the prosecution elicited further particulars about them, including the testimony of Howe that Adams's only response to his repeated offer to speak to him about the incident was to say that he needed medical attention for his knee injury. This evidence added only marginally to the issues that Adams had introduced.

More importantly, this evidence was used affirmatively at trial by the defense on both the issue of sanity and the propriety of police conduct toward Adams, as part of an apparent trial strategy.[8] That trial strategy included Adams's waiving his attorney-client privilege and calling Micciche as one of his witnesses. Micciche, a virtual witness to Adams's mental state during and immediately after the murders, testified about his interaction with Adams during this compressed period of time including his repeated advice to Adams about dealing with the police when he was arrested, and his frustration with his perception of the police treatment of both him and Adams after the arrest.[9] Whatever the specific tactical reason for proceeding in this manner and regardless of its net effect, the fact that it was part of an apparent trial strategy weighs heavily in determining the existence of constitutional unfairness and prejudicial effect. See, e.g., *Commonwealth* v. *Silva,* 431 Mass. 401, 405 (2000),

---

[7]In considering the weight or quantum of guilt, the proper consideration is "the weight of the evidence that related to the issue of sanity," because the sole issue at trial was Adams's responsibility for his actions, not whether he committed the crimes. *Commonwealth* v. *Mahdi,* 388 Mass. 679, 698 (1983).

[8]In contrast to the prosecutor, defense counsel referenced this evidence on these issues in his closing argument.

[9]Micciche's evidence also included a contemporaneous tape recording he made that was important to the defense case and that included conversation with Adams on the subject of not answering police questions.

and cases cited (in reviewing defendant's conviction we will not disregard theory on which parties proceeded at trial); *Commonwealth* v. *Fernette*, 398 Mass. 658, 666-667 (1986) (defense strategy at trial to allow jury to hear defendant's recorded post-Miranda statement did not create a substantial likelihood of a miscarriage of justice because the theory on which a case is tried cannot be disregarded on appellate review); *Commonwealth* v. *McCaster*, 46 Mass. App. Ct. 752, 763 (1999), and cases cited (defendant not entitled to second-guess trial strategy on appeal, so long as trial was fair and verdict not against weight of evidence).

Finally, the evidence of sanity was substantial although inevitably conflicting. Dr. Allen Brown, Adams's expert, testified that Adams suffered from a delusional disorder and that he lacked the substantial capacity to understand the wrongfulness of his conduct or conform it to the requirements of the law at the moment he committed the murders. Dr. Alison Fife, the prosecution's expert, testified to the opposite, that Adams was a malingerer with a personality disorder, who was exaggerating his symptoms,[10] and was not suffering from a delusional disorder. In addition, the prosecution presented a lengthy laundry list of rational, calculating, nondelusional conduct (apart from remaining silent on the advice of his attorney) admittedly engaged in by Adams before, during, and just after the crime[11] to bolster further its expert's testimony that Adams was fully capable of complex thought and action when he committed the murders, and was able to appreciate the wrongfulness of his conduct and conform it to the requirements of the law. The Commonwealth also presented the testimony of the director of forensic services at Bridgewater State Hospital that Adams

[10]Dr. Brown also testified that some of the results on the psychological tests he administered suggested a high degree of exaggerated symptoms, but Dr. Brown downplayed this aspect of the examination in light of other factors he noted in his evaluation. Dr. Fife administered one of the same psychological tests administered by Dr. Brown and found that Adams tested "literally off the charts" on the scale that measured over-exaggerated symptoms, "endors[ing] every possible psychopathy known to man." Her conclusion was that he was simply lying.

[11]For example, the Commonwealth introduced a letter Adams wrote to his wife days after the murders denying his guilt and describing how unknown intruders had killed her parents in spite of his efforts to stop them.

admitted to having falsely (and successfully) claimed the symptoms of a psychotic while being held in the Dedham jail awaiting trial so that he would be transferred to what he believed would be a less stressful hospital environment. In this context, the evidence of Adams's postarrest silence played a minor role in the battle of the experts on the question of legal sanity, with an enormous amount of personal history, conduct, and testing material as ammunition for that battle.

In sum, while the admission of evidence that Adams acted consistently with his attorney's advice and refused to answer postarrest police questions would ordinarily point to harmful error and reversal of the convictions, *Commonwealth* v. *Mahdi*, 388 Mass. 679, 697-698 (1983), we decline to do so here, where the evidence was not objected to and was initially introduced by Adams as part of a defense trial strategy, and where the weight of other evidence of sanity was substantial. In these circumstances, we do not find that there was a substantial likelihood of a miscarriage of justice.

*Request for an attorney.* Evidence of a defendant's postarrest decision to request an attorney is similarly prohibited.[12] *Commonwealth* v. *DePace*, 433 Mass. 379, 383 (2001), and cases cited. "The right to the advice of counsel would be of little value if the price for its exercise is the risk of an inference of guilt." *Id.*, quoting *Commonwealth* v. *Person*, 400 Mass. 136, 141 (1987). Adams argues that the prosecutor improperly elicited evidence of his request for counsel made at the Mansfield police station. We do not agree. Consistent with its apparent trial strategy, the defense was the first to raise Adams's telephone conversations with counsel at the police station in a substantive way.[13] This was done initially through cross-examination of the police officers, and explored further by the

[12]During the trial, the prosecutor asked questions about, and highlighted, the call Adams made to his attorney in the middle of committing the murders and setting the fire. This call was put in evidence by Adams, after waiving his attorney-client privilege. It was therefore fair game for examination and comment. That call is not at issue here.

[13]Adams's postarrest call to an attorney first came up in the prosecutor's examination of Detective Sergeant Martin, who simply testified that, at the station, he assisted Adams in making several telephone calls, including one to

defense during its direct examination of Micciche. In these circumstances, there was no error.

*Character attacks.* Adams claims that the prosecutor improperly attacked his character by appealing to racial prejudices. Specifically, Adams takes issue with the prosecutor's introduction in evidence of photographs and testimony about the birth control devices and lubricant that were found in his pocket at the time of his arrest; the prosecutor's eliciting testimony that he was "chasing white women" while in college; and the prosecutor's alleged emphasis on the interracial nature of Adams's marriage. Adams further contends that the prosecution improperly denigrated his character by attempting to portray him as lazy, stupid, flashy, a bad father, and a con man. Because defense counsel did not object to what Adams now contends was inflammatory and prejudicial evidence, we review the prosecutor's conduct and the evidence at issue to determine whether there was error, and if so, whether it created a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Williams*, 428 Mass. 383, 385 (1998), and cases cited. *Commonwealth* v. *Marquetty*, 416 Mass. 445, 450 (1993).

"References to race or national origin principally to inflame jurors or appeal to their racial or ethnic prejudices or fears constitutes prosecutorial misconduct." *Commonwealth* v. *Mahdi*, *supra* at 693. This court has held that even if "the prosecutor takes his cue from defense counsel" such references are beyond permissible limits. *Id.* See *Commonwealth* v. *Graziano*, 368 Mass. 325, 332 (1975) (finding that appeal to ethnic stereotypes went beyond permissible limits even though prosecutor took cue from defense counsel). A determination whether a prosecutor's references to race or religious beliefs were intended to inflame juror prejudice or were otherwise unfairly prejudicial to a defendant's right to a fair trial, must be made on a case-by-case basis. In making this determination, the court may consider whether the defense objected to the reference or evidence and whether the judge individually screened each juror for potential prejudice. See *Commonwealth* v. *Phoenix*, 409 Mass. 408, 425

his mother, an attorney, and someone else whose name he could not recall. This brief reference neither created an inference of guilt nor was intended to do so.

(1991). The remarks must also be analyzed in their context. See *Commonwealth* v. *Boyd*, 367 Mass. 169, 185 (1975).

The subjects of Adams's race and his religion were not irrelevant to the issues at trial. A review of the record reveals that both parties referred to them many times. Indeed, the defense put Adams's race, his religious beliefs, and his concerns about prejudice against him before the jury in its opening statement, and introduced extensive evidence on these issues throughout the trial, as important background for his insanity defense. In this context, questions by the prosecution about Adams's race and, to a lesser extent, his religious activities were not inappropriate. They were advanced to provide a more complete and balanced picture of Adams and his conduct, and not to inflame juror prejudice.

It was precisely because Adams's race and religion were inevitably going to emerge as issues at trial — at a minimum because of the interracial nature of the murders and Adams's marriage — that the judge conducted an intensive and meticulous four-day jury selection process. During this process, jurors were questioned individually by the judge on these very subjects. Many of the questions asked of the jurors were prepared by defense counsel and were specifically intended to identify possible racial and religious prejudices held by potential jurors. Compare *Commonwealth* v. *Phoenix, supra* at 425 (finding remarks not prejudicial after taking into consideration various factors including that judge had individually screened each juror for potential prejudice because such practice protects defendant from biased verdict), with *Commonwealth* v. *Madhi, supra* at 689, 691-693 (concluding prosecutor's remarks about defendant's race and religious beliefs prejudiced jury where there was no inquiry into possible bias of jurors).

We now turn to an analysis of some of Adams's objections to specific evidence. Adams complains that the prosecutor offered evidence that at the time of his arrest Adams had condoms and lubricant in his possession, and urges the court to conclude that the admission of this evidence was improper because the prosecutor was playing on prejudices regarding the purported sexual appetite of black men. The evidence was relevant. Condoms and lubricant as well as two watches were in Adams's

possession when he was arrested. A single photograph of all of the items found on his person was introduced in evidence by a police witness, whose testimony also described what each item was. Later in the trial, the two watches were identified as having belonged to the Levesque family. The presence of the condoms and lubricant in Adams's possession was deemed significant evidence of nondelusional, organized thinking by the expert witness called by the Commonwealth. Specifically, the expert witness testified that Adams explained to her that he took the condoms and lubricant from the murder scene because he knew he would not be returning to the Levesque home that night, but would likely be spending the night with his wife. Consequently, he needed to bring their birth control devices along with him. This thought pattern was deemed by the witness to be inconsistent with the mental disorder that Adams's claimed had overwhelmed him at the time of the murders. No other use was made of the evidence, and nothing further suggested. In this context, admission of the evidence was neither inflammatory nor unfairly prejudicial.

The testimony about Adams's "chasing white women" also came from the Commonwealth's expert who was testifying about what Adams told her during clinical interviews. The witness was comparing Adams's perception of the reason for his dismissal from Norwich University with the reason reflected in the university's records. Adams claimed that "chasing white women" at St. Michael's College (where his wife was a student) was one of the reasons for his dismissal; the Norwich University records reflected a very different set of reasons. The reference was made only once and the defense did not object. The question was proper and the answer not inflammatory when viewed in context. That context was a lengthy examination of the differences between what Adams perceived as the reasons why a number of bad things had happened to him during his life, and what independent sources revealed as to the reasons those things had occurred. A similar line of questioning was pursued by the prosecutor in his questioning of the defense expert. Both experts agreed that Adams had a marked tendency to exaggerate and distort the past, and that his stated perceptions often differed dramatically from reality. The Commonwealth's expert testified

that this pervasive pattern of blaming others for his failures and misfortune was symptomatic of a personality disorder that she found that Adams had, not a delusional disorder from which Adams claimed he suffered. The conclusion to be drawn was that Adams's claim that he killed the Levesques because of a delusional disorder was yet another manifestation of this personality disorder, in which blame is attributed to other people or outside forces. In this respect, the evidence was relevant, and its admission neither inflammatory nor unfairly prejudicial.[14,15]

Adams also complains about the prosecutor's questioning of his ownership of a Mercedes Benz automobile despite his lack of steady employment, his wife's working two jobs during the marriage and paying all the bills, and his "malingering." In addition, Adams complains that the prosecutor, in questioning defense witnesses, sought to establish that he was overly fervent in his political and religious views and that he was at bottom just a "con man." Finally, Adams complains that the prosecutor elicited evidence about Adams's job at a slaughterhouse and how he "had a high tolerance for blood."

Virtually all of this evidence came in through the cross-examination of defense witnesses called to testify about Adams's background (including his job history and his marriage); his attitudes, character, and personality; and his deteriorating state of mind in the months preceding the murders. In this context, the prosecutor's questioning was intended to provide a more complete picture of Adams on the very subjects about which defense witnesses were called to testify. It was neither inappropriate nor unfairly prejudicial.

In sum, the trial was hard fought and vigorously contested on every point by very experienced trial counsel representing both sides. The evidence of which Adams now complains was relevant and not objected to during trial, apparently because it

---

[14]It was also an example of how Adams perceived he was being racially discriminated against by those around him, including his in-laws, a subject which came up in the background evidence presented by Adams at trial. In this sense it was consistent with the evidence Adams was presenting regarding his view of the world.

[15]Although Adams also complains that the prosecutor focused on and emphasized his interracial marriage in some inflammatory way, there is no support for this contention in the trial record.

was not seen as unduly prejudicial in the context of the defendant's trial strategy. See *Commonwealth* v. *Kozec,* 399 Mass. 514, 518 n.8 (1987) (absence of objection by defense counsel during or after argument may provide guidance whether particular argument was prejudicial). The judge conducted an extensive voir dire of the jurors on issues of racial and religious prejudice which helped to protect the defendant from potential juror prejudice, see *Commonwealth* v. *Phoenix,* 409 Mass. 408, 425 (1991), and we must attribute a certain sophistication to the jury in sorting through the evidence and comments made during trial, and properly considering it outside the heat of battle. In these circumstances, we find no error.

*Evidence of prior bad acts.* It is well settled that the prosecution may not introduce evidence that a defendant has previously misbehaved, indictably or not, for the purpose of showing his bad character or propensity to commit the crime charged. *Commonwealth* v. *Trapp,* 396 Mass. 202, 206 (1985). Such evidence, however, may be admissible if it is relevant for some other purpose such as state of mind, plan, scheme, motive, or knowledge. *Commonwealth* v. *Libran,* 405 Mass. 634, 640 (1989). In this case, the trial judge entered a pretrial ruling that the prosecution would not be permitted to offer in its case-in-chief evidence of three incidents of violence and threatened violence by Adams against his wife.[16]

During the trial, the judge permitted the prosecutor to elicit evidence of one of the violent incidents (the one in Vermont that precipitated his wife's leaving) in its cross-examination of a defense witness. The witness was called to testify about Adams's changing character and deteriorating condition during the period following the hit and run accident. The witness mentioned on direct examination that there had been a fight between Adams and his wife which culminated in her leaving him, but did not testify as to the details. On cross-examination, the prosecutor elicited the details of the fight (as told to the wit-

___

[16]The prosecution was seeking to introduce evidence about the incident in Vermont where Adams held a knife to his wife's throat, which led to her departure and move to Massachusetts; another incident where Adams held a knife to his wife's throat while they lived in Foxborough; and an incident the night before the murders where the defendant got so angry with his wife he pulled their car off the road and threatened to smash all the windows with a golf club.

ness by Adams), both to rebut what he viewed as character evidence offered by the witness and because the witness had opened the door to the issue. The judge ruled that such examination was permissible for those purposes.[17] The admissibility of prior bad act evidence lies in large measure in the trial judge's discretion, and we accept it absent palpable error. *Commonwealth* v. *McGeoghean*, 412 Mass. 839, 841 (1992). We do not find palpable error in the judge's ruling on the admission of this evidence.

In any event, evidence of all three prior instances of violence became relevant and was properly admitted when the defense expert testified about Adams's sanity. Dr. Brown testified that he had conducted a complete evaluation of Adams's past relevant conduct and concluded that he suffered from a delusional disorder when he committed the murders. On cross-examination, the prosecutor asked him whether he was aware of and had considered the three acts of violence that occurred very close in time to the murders. Dr. Brown acknowledged that Adams's prior acts of violence toward his wife were "very significant" events that he considered in his evaluation of Adams's mental state, although he concluded that those acts were not the result of Adams's delusional disorder. Subsequently, Dr. Fife testified that this conduct was important to an evaluation of Adams's mental state at the time he committed the crimes and evidenced an individual with extreme anger and rage, anger and rage that the Commonwealth alleged Adams unleashed when he murdered the Levesques.

As was obvious to the experts in the case, the evidence was particularly relevant to their evaluation of Adams's mental state during the time period when he committed the crimes.[18] In such circumstances, its admission and use was not for the purpose of proving propensity or bad character. Compare *Commonwealth* v. *Libran, supra* at 641 (judge did not err in admitting testimony

---

[17]See *Commonwealth* v. *Brown*, 411 Mass. 115, 118 (1991) (judge may permit cross-examination on matters that are inconsistent or in conflict with character trait to which witness has testified). See also P.J. Liacos, Massachusetts Evidence § 4.4.2 (7th ed. 1999 & Supp. 2001).

[18]While Adams objected prior to trial to the admission of all of the prior incidents of violence, and objected during trial to the elicitation of one of those incidents during the cross-examination of one of Adams's character wit-

as to defendant's using knife and disposing of it night before murders because it was relevant to both sanity and state of mind), with *Commonwealth* v. *Trapp, supra* at 207 (prior bad act evidence held not to be probative on issue of sanity where Commonwealth's contention that someone with defendant's mental defect would not have been able to make threats or engage in altercation defied logic, experience, and common sense, and was not supported by expert testimony). The decision to admit the evidence was well within the discretion of the trial judge, which we see no basis to disturb.

*Prosecutor's closing arguments.* Adams argues that during his closing argument the prosecutor improperly exhorted the jury to "do its job" by returning a guilty verdict. While we have noted that arguments suggesting it is the jury's "job" or "duty" to return verdicts of guilty cross the permissible line of advocacy, *Commonwealth* v. *Degro,* 432 Mass. 319, 328 (2000), it is not a line the prosecutor crossed in this case. At the conclusion of his argument, the prosecutor:

> "It is now time for you to do your job, and that job is a simple job in this context. That you take the evidence, that you apply it against the law, and that you deliberate and you do that without [ignoble] motivations. You do that with honor. And I suggest, ladies and gentlemen, that when you do that, you will not be conned by this man. That you will return verdicts of guilty . . . ."

Framed in this way, the reference to the jury's "job" did not contain the suggestion of a duty to convict that we have found unacceptable in other instances. This was not improper argument.

3. *G. L. c. 278, § 33E.*

We have reviewed the entire record of the defendant's trial pursuant to G. L. c. 278, § 33E, and we see no reason to exercise our authority to reduce the jury's murder verdicts or order a new trial.

*Judgments affirmed.*

nesses, no objection was made to their extensive use in the cross-examination of the defense and Commonwealth's experts.