## COMMONWEALTH *vs.* HOA SANG DUONG.

No. 00-P-199.

Middlesex. May 18, 2001. - October 17, 2001.

Present: GREENBERG, GILLERMAN, & DOERFER, JJ.

*Joint Enterprise. Evidence,* Joint enterprise. *Practice, Criminal,* Comment by prosecutor, Instructions to jury. *Robbery. Receiving Stolen Goods.*

Evidence at the trial of criminal indictments was sufficient to support jury verdicts of guilty on a theory of joint venture, where the jury could have inferred the identity of the defendant as the person who fled the scene of the crime based solely on the circumstantial evidence presented. [866-867]

At the trial of indictments for armed robbery and other related crimes, there was sufficient evidence to satisfy the knowledge or intent element of joint venture participation, where the jury could have inferred from the large size of the weapon used in the crime that the defendant knew his accomplices would use the weapon to commit the crime. [867]

At the trial of indictments for armed robbery and other related crimes, there was sufficient evidence of the defendant's presence at the crime, knowledge of the crime, and participation in the crime to reach a jury on a theory of joint venture, including evidence permitting inferences that the defendant was next to or inside an automobile parked nearby while the crime was being committed in order to protect the car and help the other accomplices if needed, and that the defendant was not merely a witness to the crime, but an accomplice who fled to evade capture, thus preventing the officers who came upon the scene from questioning him about the crime. [867-868]

At the trial of indictments for armed robbery and other related crimes, in which the defendant placed his identification in issue and identification testimony included descriptions of the robbers' racial characteristics by witnesses who described what they saw, the prosecutor's reference to racial identity, without more, did not create a substantial risk of a miscarriage of justice. [868-869]

At the trial of indictments for armed robbery and other related crimes, there was no substantial risk of a miscarriage of justice created by that portion of the judge's instructions to the jury relating to the "knowledge" requirement of joint venture participation, where the evidence presented at trial was such that the jury could not have been misled by the judge's instructions, even though the judge failed to mention that the Commonwealth's proof required knowledge on the defendant's part that his accomplice was armed. [869-870]

Where, at a criminal trial, the defendant was convicted of both armed robbery and receiving stolen property and, on appeal, the defendant argued, and the

Commonwealth conceded, that the convictions were inconsistent, this court vacated the judgment on the receiving stolen property indictment and let stand the remaining convictions, including that of armed robbery. [870]

INDICTMENTS found and returned in the Superior Court Department on November 19, 1998.

The cases were tried before *Charles M. Grabau*, J.

*David Duncan* for the defendant.

*Sheryl F. Grant*, Assistant District Attorney, for the Commonwealth.

GREENBERG, J. At around 10:00 P.M. on the evening of May 5, 1996, Yushio Uda locked the doors to his Japanese eatery, Roka, located at 10 Muzzey Street in Lexington. Before closing down for the night he heard what he thought was someone trying to open the front door. At 10:30 P.M. Uda left the premises carrying the money and receipts from the night's business in a blue bag. He proceeded across Muzzey Street to his car, opened the door, and placed the bag on the front passenger seat. He backed out of his space, and then, as he began to drive ahead, three young Asian males jumped in front of his car. Peering through the windshield, he saw one of the men pointing a machine gun at him. The three robbers entered the car and sat in the rear seat. The one brandishing the gun held it to the back of Uda's neck, pushing his head forward, almost touching the windshield.. The robber, in English, demanded to know where the money was. Uda pointed to his blue bag in the front passenger's seat. They took the bag and began to search Uda, taking his watch, a necklace, and his wallet, which contained about $1,000 in cash. They demanded that he remove the key from the ignition and threatened to kill him if he failed to give it to them. Uda complied, and the robbers left Uda's car and ran to a white car parked about twenty yards away on Muzzey Street.

As these events were unfolding, Paul Thomas was at his mother's real estate office located at 7 Muzzey Street. Her office was on the second floor of a building which was diagonally across the street from the Roka restaurant, about twenty to thirty feet from Uda's car. At about 10:30 P.M. Thomas saw Uda

leave the restaurant and walk toward the lot where he had parked his car. The parking lot was well lit. As Uda was backing out of his parking space, Thomas saw three Asian men run across the street from the restaurant. He noticed that one of the men had a gun pointed at the windshield. Then he observed all three men enter the back seat of Uda's car. He told his mother to call the police as he continued watching. He could see the men point a gun at Uda's head and saw Uda pass some objects to them. After about one and one-half minutes, the men left the car and ran to a white car parked about fifty to seventy-five feet away from Uda's car.[1]

Within seconds of receiving the dispatch, Officer George Snell, a Lexington police officer, arrived at the scene. As he approached, he observed four men running to a white Toyota Camry and getting into the car, one at each of the car's four doors.[2] Snell pulled in front of the Toyota, put his lights on and got out of the cruiser. Four men ran from the vehicle. The two on the driver's side ran east on Massachusetts Avenue and the two on the passenger's side ran west on Massachusetts Avenue. Snell observed that the man sitting in the rear driver's side closed the rear driver's side door as he left the vehicle.[3] The other three men did not close their doors as they fled the vehicle. Officer Paul Callahan, another Lexington police officer, arrived at the crime scene shortly after Snell. He observed that the rear driver's side door was closed, but all of the other doors were open. Although Snell and Callahan did not put anything in their initial reports about the rear driver's side door being closed, Detective Robert Mercer, the lead investigator that night, recalled Snell and Callahan telling him on the night of the rob-

---

[1]At trial Thomas was unable to identify the defendant as one of the men involved in the incident on May 5, 1996.

[2]There is some conflict in the testimony regarding how many men ran to the car and whether they actually got back into the car. Contrary to Snell's testimony, Uda and Thomas testified that they only saw three men running toward the car. There also seems to be some discrepancy between Uda's and Thomas's testimony as to whether the three men ever got into the car once they reached it. Thomas testified that the three men reached the car and opened the doors but did not get in the car. Uda testified that all four got out of the car when the officer arrived.

[3]Thomas also testified that as far as he could remember the fourth person left the car from the driver's side, but he was not certain.

bery that the rear driver's side door had been closed by one of the fleeing suspects. Mercer also testified that he observed that three of the doors were open but that the rear driver's side door was closed.[4]

After a sweep of the area, police investigators found two Asian men hiding in the bushes about one-fourth of a mile from the robbery scene. Uda and Thomas later positively identified the two men as two of the men involved in the incident. Uda's watch, necklace, and wallet were found on one of the men. A search of the immediate area also yielded a nine-millimeter Uzi machine gun in an alleyway about twenty-five feet from the robbery scene and the blue money bag about twenty-five feet from the Toyota in the direction the robbers ran. The machine gun had a magazine and live rounds, but was later determined to be a nonfunctioning replica.

At around 6:45 A.M. on the morning of May 6, 1996, Callahan was patrolling Massachusetts Avenue in Lexington Center about three or four blocks from where the robbery had taken place. He noticed a young Asian man on the porch of a multi-office building ducking down behind some shrubs. He continued a little further, then turned his car around and approached the young man, the defendant. Callahan told the defendant that he was investigating an incident involving Asian males. He asked the defendant why he was on the porch, and the defendant replied that he was waiting for a friend. Callahan asked why the defendant needed to be on the porch when it was not raining out, and the defendant replied that he had no particular reason. With the defendant's consent, Callahan searched the defendant's backpack and found clothing with department store tags on them. When asked where his friend was, the defendant said he was supposed to meet his friend, who was coming from Charlestown, at 6:30 A.M. to exchange the clothes he had in his bag. The defendant said that his mother had driven him to the Alewife MBTA station in the morning and that he took the bus to get to Lexington to meet his friend. Three bus drivers working the route that would have been taken by the defendant from

---

[4] In Mercer's report from that night, however, he indicated that it was not the rear driver's side door that had been closed. Mercer testified at trial that that was a misprint.

Alewife on the morning of May 6, 1996, testified at trial that they did not recall having any young Asian male passengers that morning. In addition, during the conversation the defendant produced identification showing that he had an Everett address. As Callahan further questioned the defendant about whether he had taken a bus that morning, the defendant suddenly stopped answering his questions. Callahan then asked where the defendant's friend was and the defendant said he did not understand the question, despite showing no signs of communication problems until that point. The defendant was shivering throughout the entire fifteen to twenty minute conversation. Callahan did not arrest the defendant at that time.

Detective Mercer and Lieutenant Steven Corr investigated the crime scene on the evening of May 5, 1996. During their investigation, they located a fingerprint on the outside of the window behind the driver's side door of the white Toyota Camry, the same door Snell observed one of the suspects close as the suspect fled from the vehicle. Trooper Mary Richie of State police crime scene services analyzed the print and later identified it as matching prints from the defendant's left index finger.

On November 18, 1998, a grand jury indicted the defendant, charging him with armed robbery, conspiracy to commit armed robbery, assault and battery by means of a dangerous weapon, receiving stolen property, and possession of ammunition without a firearm identification card. The defendant was tried by jury on all counts except the conspiracy charge. At the close of the Commonwealth's case, the defendant filed a motion for required findings of not guilty. The motion was denied, and the defendant rested without presenting any evidence. The jury returned a not guilty verdict on the possession of ammunition without a firearm identification card charge and a guilty verdict on all other charges.

On appeal, the defendant argues that (1) the evidence was insufficient to support the verdicts; (2) the prosecutor improperly appealed to racial stereotypes in his closing argument; (3) the trial judge failed to properly instruct the jury that they must find the defendant knew a coventurer was armed; and (4) his conviction on the count of receiving stolen property is inconsistent with his conviction on the count of armed robbery.

The defendant's strongest argument is that the Commonwealth presented insufficient evidence of his participation in a joint venture, and that his motion for a required finding of not guilty should have been allowed. Criminal liability in a joint enterprise is premised on (1) a defendant's presence at the scene of the crime; (2) with intent to commit the crime charged or with knowledge that another intends to commit the crime charged; and (3) by express or implicit agreement is willing and available to help the other in effecting his criminal purpose. See *Commonwealth* v. *Longo*, 402 Mass. 482, 486 (1988); *Commonwealth* v. *O'Neil*, 51 Mass. App. Ct. 170, 171-172 (2001). We review the evidence in the light most favorable to the Commonwealth to determine whether it is sufficient as a matter of law to satisfy a reasonable jury of each element of the defendant's participation in the joint venture beyond a reasonable doubt. See *Commonwealth* v. *Martino*, 412 Mass. 267, 271-272 (1992); *Commonwealth* v. *Mattos*, 49 Mass. App. Ct. 218, 222 (2000). See also *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-677 (1979).

1. We begin with the first element of proof for joint venture: the defendant's presence. The defendant states correctly that no eyewitness identified him as present at the crime scene, nor did he possess stolen property when Officer Callahan frisked him shortly after his apprehension. The defendant argues that his fingerprint on the getaway car and his presence in Lexington in the early morning after the robbery do not permit an inference of his presence at the scene during the time of the crime. Even so, that evidence was bolstered by two key witnesses' direct testimony that they saw a fourth young Asian man close the rear driver's side door as he fled the getaway car. "In cases in which the evidence is largely circumstantial, it is not essential that the inferences drawn should be the only necessary inferences. . . . It is enough that [the inferences] be reasonable and possible. . . . To the extent that conflicting inferences are possible from the evidence, it is for the jury to determine where the truth lies" (citations omitted). *Commonwealth* v. *Coonan*, 428 Mass. 823, 828-29 (1999), quoting from *Commonwealth* v. *Lydon*, 413 Mass. 309, 312 (1992). The jury could have inferred that the fingerprints belonged to the young Asian male who

closed the rear driver's side door when he fled the scene at approximately 10:30 P.M., only to be found shivering early the next morning not far from the scene of the crime. Further, the jury could have disbelieved the defendant's statement, offered through the testimony of Callahan, that he had taken the bus from Charlestown that morning and was waiting to meet a friend. See *Commonwealth* v. *Kilburn*, 426 Mass. 31, 33-37 (1997); *Mattos*, 49 Mass. App. Ct. at 222-223 (jury could infer identity of defendant as person in car at scene of crime based solely on circumstantial evidence).

2. The defendant also argues that the Commonwealth did not produce sufficient evidence to satisfy the second element of joint venture participation: knowledge or intent. We disagree. The facsimile machine gun was large and would have been difficult to conceal. In fact, Thomas, one of the Commonwealth's witnesses, testified that he saw the gun from an overlooking window, twenty to thirty feet away. The jury could thus infer that the defendant knew his accomplices would use the machine gun to commit the crime. "A person's knowledge or intent is a matter of fact, which is often not susceptible of proof by direct evidence, so resort is frequently made to proof by inference from all the facts and circumstances developed at the trial." *Mattos*, 49 Mass. App. Ct. at 223, quoting from *Commonwealth* v. *Casale*, 381 Mass. 167, 173 (1980). There was sufficient evidence of the defendant's knowledge.

3. The defendant also argues that the Commonwealth did not produce sufficient evidence to satisfy the third element of joint venture participation: an agreement to be willing and available to help the accomplice(s) if necessary. In *Commonwealth* v. *Mazza*, 399 Mass. 395, 397-400 (1987), the Supreme Judicial Court concluded that evidence of consciousness of guilt plus presence at the scene of the crime alone were insufficient to support a verdict of first degree murder. In the instant case, there was additional evidence of the defendant's participation in the robbery: three Asian men accosted Uda (a fourth acted as a "look-out"), and the defendant fled after the arrival of the police car. Such evidence permits an inference that the defendant was next to or inside the Toyota while the crime was being committed in order to protect the car and help the other ac-

complices if needed. See *Commonwealth* v. *Brooks*, 422 Mass. 574, 577 (1996). Inferentially, the defendant was not merely a witness to the crime, but an accomplice who fled to evade capture, thus preventing the officers who came upon the scene from questioning him about the crime. See *Commonwealth* v. *Fuentes*, 45 Mass. App. Ct. 934, 936 (1998) ("Evidence of flight is probative of joint venture responsibility"). Although a close question, we conclude there was sufficient evidence of the defendant's presence at the crime, knowledge of the crime, and participation in the crime to reach a jury.

4. The defendant argues on appeal that by making use of the phrase "gang of four" in his closing argument, the prosecutor made a blatant appeal to the jury's prejudices by referring to the group responsible for the cultural revolution in China that caused the death and humiliation of many innocent persons. The phrase, however, has other meanings. The prosecutor, in his closing argument, used the phrase in an attempt to show that the defendant participated in a joint venture. "Within the bounds of the evidence and the fair inferences from the evidence, great latitude should be permitted to counsel in argument." *Commonwealth* v. *Gilmore*, 399 Mass. 741, 745 (1987). Perhaps there may be instances where the use of the phrase "gang of four" may be considered an appeal to "racial or ethnic" prejudices. This, however, is not such a case. Cf. *Commonwealth* v. *Adams*, 434 Mass. 805, 816 (2001).

A closer question is whether the prosecutor, during final argument, engaged in misconduct by raising the rhetorical question, "how many young Asian males do you think there were in Lexington Center at 6:45 A.M. [that morning]?" See *Commonwealth* v. *Mahdi*, 388 Mass. 679, 693 (1983) ("References to race or national origin principally to inflame jurors or appeal to their racial or ethnic prejudices or fears constitute prosecutorial misconduct"). In the instant case, the defendant did not object to any portion of the closing argument. Identification testimony included descriptions of the robbers' racial characteristics by witnesses who described what they saw. There is no question that the defendant placed his identification in issue. Therefore, in context, we do not find that the prosecutor's reference to racial identity, without more, constituted a substantial

risk of a miscarriage of justice. Compare *Commonwealth* v. *Leitzsey*, 421 Mass. 694, 701 (1996) (remarks to jury regarding witness's race relevant to jury), and *Adams*, 434 Mass. at 816-817 (same), with *Commonwealth* v. *West*, 44 Mass. App. Ct. 150, 152 (1998) (remarks to jury regarding witness's race irrelevant to jury).

5. It is primarily with respect to the "knowledge" requirement that the defendant claims that the judge's instructions were deficient. The applicable portions of the judge's instructions on joint venture are set forth in the margin.[5] In particular, the defendant contends on appeal that the judge failed to instruct the jury that they had to find that the defendant knew that one of his accomplices was armed. To satisfy this requirement in a case where armed robbery is the underlying felony, the Commonwealth must prove that the defendant actually knew or had reason to believe that his accomplice was armed. No objection was made by the defendant's trial counsel to the instructions. We examine the defendant's contention to ascertain whether anything was stated that would create a substantial risk of a miscarriage of justice.

We discern no such risk. The evidence in the case was uncontroverted that one of the robbers was armed with what appeared to be a dangerous weapon. Both counsel focused their summations on whether the defendant was present at the time of the robbery. There was no question, as we noted in section 2 of our opinion, that the weapon utilized during the course of the crimes involved was so large as to be unconcealable. If the jury found that he was there, as appears from the verdict, the inference is reasonable that he knew about the weapon. See *Commonwealth* v. *Stewart*, 411 Mass. 345, 350-353 (1991). In sum,

---

[5]The judge told the jury, "The Commonwealth contends that [the defendant] . . . shar[ed] [with the coventurers] the intent required to commit the crimes of armed robbery, assault and battery by means of a dangerous weapon, receiving stolen goods, and unlawful possession of ammunition." He defined this intent as "something that [the defendant] wished to bring about and that he sought by his actions to make it succeed." He also instructed the jury that "the Commonwealth must prove the following elements beyond a reasonable doubt, that this defendant participated, aided, or assisted in the commission of the crimes charged, . . . or he stood by willing and able to help with the crime if it became necessary; . . . [and] that the defendant did so while sharing the intent required to commit the crime."

the jury could not have been misled by the judge's instructions, even though he failed to mention that the Commonwealth's proof required knowledge on the defendant's part that his accomplice was armed.

6. The defendant was convicted of both armed robbery and receiving stolen property. The defendant argues, and the Commonwealth concedes, that the convictions were inconsistent. See *Commonwealth* v. *Nascimento*, 421 Mass. 677, 682-683 (1996). The judgment on the receiving stolen property count must therefore be vacated, and the verdict set aside. See *id.* at 684-685. The judgments on the remaining convictions are affirmed.

*So ordered.*