NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

14-P-382                                          Appeals Court

COMMONWEALTH  vs.  TIMOTHY SHRUHAN.

No. 14-P-382.

Suffolk.     October 1, 2015. - April 19, 2016.

Present:  Cypher, Milkey, & Massing, JJ.


Assault and Battery by Means of a Dangerous Weapon.  Evidence,
     Hearsay, Admitted without objection, Prior misconduct,
     Argument by prosecutor, Identification.  Practice,
     Criminal, Hearsay, Failure to object, Argument by
     prosecutor, Instructions to jury.  Identification.



     Indictment found and returned in the Superior Court
Department on April 15, 2011.

     The case was tried before Thomas A. Connors, J.


     Charles W. Rankin (Kerry A. Haberlin with him) for the
defendant.
     Paul B. Linn, Assistant District Attorney, for the
Commonwealth.


     CYPHER, J.  The defendant, Timothy Shruhan, appeals from

his conviction by a Superior Court jury on August 24, 2012, of

aggravated assault and battery by means of a dangerous weapon,

G. L. c. 265, § 15A(c).  Now, with new counsel, he seeks a new

trial, alleging that cumulative errors in the admission of inflammatory evidence[1] and that the prosecutor's appeals to the jury's emotions created a substantial risk of a miscarriage of justice. We affirm.

Background. On the afternoon of September 11, 2006, Timothy Cahill stopped at The Quencher Tavern (Quencher), a neighborhood bar near a community center where he worked in the South Boston section of Boston, met his father briefly, and ordered a cheeseburger to go. While he was walking on I Street back to work, a man he did not know, later identified as the defendant, rushed out of the driver's seat of a nearby parked automobile, yelling, "Hey, Joey." The defendant, mistaking Cahill for a South Boston man (Joe Pano), apparently aimed to settle a score over a stolen item. He stabbed Cahill in the abdomen causing life threatening injuries. Both "kind of stumbled" and the victim, who was immediately aware that he had been stabbed, put one hand on his wound and ran to the Quencher. More than once, he exclaimed, "I'm not Joey."

---

[1] Prior to trial, the defendant filed a motion in limine, which was denied. Generally a motion in limine is insufficient to preserve a party's appellate rights on an evidentiary issue unless that party makes a proper objection at trial. See Commonwealth v. Whelton, 428 Mass. 24, 25 (1998). "Without an objection at trial, which gives the judge an opportunity to reconsider the issue in context, any harm resulting from a ruling in limine is purely speculative." Commonwealth v. Joyce, 464 Mass. 16, 18 (2012).

3

The defendant gave chase but soon quit and ran back to the car, still occupied by his companion, Robert Glavin.  The defendant drove off but not before a passerby, Jessica Bianco, had memorized the car's license plate number.  Upon reaching her home on East Sixth Street, Bianco telephoned the police and passed on her observations.  She had noticed the Infiniti emblem on the rear of the car and described it as silver in color and bearing Massachusetts license plate number 65VB42.

At the restaurant, several patrons and friends attempted to stop the bleeding from the stab wound and called for emergency assistance.[2]  Extraordinary measures implemented by an off-duty Boston firefighter, Frederick Finn, and the quick assistance of others in the restaurant, saved Cahill's life.  Cahill was soon transported to the Boston Medical Center (BMC).  Dr. Peter Burke, one of a team of physicians who performed the emergency surgery, testified as to the extensive injuries and complications that the victim had sustained.  Cahill required several surgeries and some four months to recover.

With only the information on the attacker's misidentification of Cahill as Joey Pano, and no witnesses or any physical evidence at the scene, the police were unable to

---

[2] Cahill told Kim Connolly, one of the friends who came to his aid, that he did not know who had stabbed him, but said that the attacker thought that he was Joey Pano, and that he had protested that he was not Pano.

find the car or determine the identity of the attacker until 2009, after the car had been located and their investigation led them to the defendant, Robert Glavin, and other acquaintances of the defendant.[3]

Jill McIntyre testified that on the afternoon of September 11, 2006, the defendant and Glavin left her house in the midafternoon and returned after 3:30 P.M. She observed that they "were very sweaty and very shaky" upon their return. McIntyre overheard the defendant say that they had "fucked up" and "got the wrong person."

The defendant telephoned Maryanne McColgan, the mother of his two children, and asked her to drive to a nearby fast food outlet where he and Glavin would be waiting. At trial, McColgan testified that when she picked them up, both men appeared to be "a little nervous, kind of just not themselves." McColgan drove a short distance on West Broadway Avenue before both men got out of her car near a Massachusetts Bay Transportation Authority (MBTA) train station.

---

[3] The car was found on a street in the Dorchester section of Boston in 2008. At that time, it had a different license plate than the one observed at the scene of the stabbing, but that license plate was found in the trunk of the car. Police traced the car through its vehicle identification number (VIN) to its owner, and found that it was used by the owner's boyfriend, Stephen Noltemy, who testified that he had sold it to the defendant.

Glavin testified that he had been in the Infiniti with the defendant on I Street that afternoon and had pointed out a person he believed to be Joseph Pano.  According to Glavin, "We pulled over.  He [the defendant] jumped out of the car.  I turned around and looked out the back of the car and I seen (sic) him stab the kid and then run back to the car and then we drove away." [4]

The defense was based on a theory of mistaken identification and misdirection by the Commonwealth.  Through cross-examination of the Commonwealth's witnesses, defense counsel elicited testimony that Cahill had identified Stephen Noltemy, see note 3, supra, as his assailant and had not selected the defendant, even though his photograph was included in the same photographic array.  The defendant also established that he had not been identified by any percipient witness.  In addition, on cross-examination of Glavin, McIntyre, and Noltemy, defense counsel attempted to demonstrate that the three had a history of drug use and that Glavin and Noltemy also had a history of petty crime, rendering them all less than credible witnesses.

Discussion.  The defendant broadly asserts that this case was not properly tried, claiming that the "prosecutor succeeded

---

[4] Glavin informed the jury that he had pleaded guilty in 2011 as an aider or abettor.

in getting before the jury patently inadmissible evidence -- some of it was hearsay, some of it was minimally probative but highly prejudicial, and all of it served only to evoke sympathy for Cahill and ire for Shruhan." More specifically, the defendant focuses on the admission of testimony of the victim's parents, relatives, and friends, all of whom, the defendant says, evoked ire against him and sympathy for the victim; certain testimony from a Boston police officer who stated that, in his presence, Cahill had voiced misgivings of an earlier pretrial identification, which he made from a photo array; and the prosecutor's closing argument, which, the defendant asserts, was inflammatory and prejudicial.

1. The testimony of the victim's parents, relatives, and friends. The defendant argues that the "sheer number of witnesses called to testify to Cahill's injuries is troubling." The defendant asserts that the testimony was irrelevant, emotionally-fraught, and inadmissible. He claims that certain accounts of Cahill's injuries were sensationalized. The defendant supports this argument with references to the testimony of family members present at the Quencher, whose testimony describe the efforts made to control Cahill's bleeding and prepare for the arrival of medical assistance and his transport to a hospital.

The primary difficulty with the defendant's argument, however, is that at trial the defendant offered no resistance to the testimony.  The defendant's strategy was made quite plain when his counsel delivered the opening statement, outlining what would be a recurring theme in the case.  Counsel told the jurors that they would hear from "a whole lot of witnesses and . . . hear a whole lot of evidence" that he predicted would have "nothing to do with whether [the defendant] is guilty of something."  Counsel also told the jurors that they may feel "intense sympathy for [the victim] and his family,"  and he advised them that emotion had nothing to do with their decision in the case.  By describing the case in these terms, counsel prepared the jurors for what would follow in the Commonwealth's case, suggesting that the presentation of witnesses was an effort by the Commonwealth, deliberate and purposeful, to distract the jurors and make its case appear to them to be stronger than it was in actuality.  Counsel suggested that "eighty or ninety percent of the evidence [that] the Commonwealth is going to present -- I mean they have to present it, but it doesn't have a lot to do with the identity of the person who stabbed Tim Cahill."  Counsel returned to this theme again in his closing argument, imploring the jury to acquit and asserting that the Commonwealth did not have the facts or law on its side.

Having elected to pursue this approach at trial, the defendant cannot change tactics on appeal based on the fact that he did not achieve the desired result. "Counsel may not try a case on one theory of law, and then obtain appellate review on another theory which was not advanced at trial. . . . Appellate review should not be the occasion to convert the 'consequences of unsuccessful trial tactics and strategy into alleged errors by the judge.'" Commonwealth v. Lazarovich, 410 Mass. 466, 476 (1991), quoting from Commonwealth v. Johnson, 374 Mass. 453, 465 (1978). See Commonwealth v. Adams, 434 Mass. 805, 813-814 (2001) (regardless of specific tactical reason for proceeding in a certain manner and regardless of its net effect, the fact that it was part of an apparent trial strategy weighs heavily in determining the existence of unfair prejudice).

In any event, there was no substantial risk of a miscarriage of justice. A fair reading of the testimony does not support a conclusion that the testimony was unduly prejudicial to the defendant. None of the testimony did more than describe the shock family members and friends experienced and their awareness that Cahill's injuries were serious. None of the testimony is directed at the defendant who was unknown to them at the time. Much of the testimony supports the evidentiary basis for the "serious bodily injury" element of the charged crime pursuant to G. L. c. 265, § 15A. There was no

error in the admission of the testimony, but considering the defense strategy, even if the testimony should not have been admitted, it did not create a substantial risk of a miscarriage of justice.

2.  Testimony of police Officer Robert Flynn, Jr.  The defendant argues that the testimony of police Officer Robert Flynn, Jr., in which he stated that Cahill had recanted his pretrial identification of Noltemy, created a substantial risk of a miscarriage of justice.[5]  According to the defendant, this "rank hearsay eviscerated" the defendant's exclusive defense.  Again, the defendant's argument on appeal is precluded by the trial strategy adopted by defense counsel.  Although the defendant objected at first to Officer Flynn's testimony, defense counsel withdrew the objection.[6]  In closing argument, defense counsel addressed Flynn's testimony about Cahill's recantation of his identification of Noltemy by arguing that the testimony was "baloney," and that Cahill honestly believed Noltemy was the stabber, but that the Commonwealth had called Flynn to testify only because it wanted to "make their case a

---

[5] Sometime after Cahill had identified Noltemy, he was out with friends, including Officer Flynn.  Cahill told Flynn that he had "messed up" and identified the wrong person.

[6] "Hearsay, once admitted, may be weighed with the other evidence, and given any evidentiary value which it may possess." Commonwealth v. Keevan, 400 Mass. 557, 562 (1987), quoting from Mahoney v. Harley Private Hosp., Inc., 279 Mass. 96, 100 (1932).

little better than it is."  Thus, once again, defense counsel did not object to the evidence but instead embraced it and attempted to use it to demonstrate the Commonwealth was trying to mislead the jury.  See Commonwealth v. Adams, 434 Mass. at 813-814.  There was no error in the admission of the hearsay in these circumstances, but even if there was, it did not create a substantial risk of a miscarriage of justice.

3.  Alleged bad character evidence.  The defendant argues that the prosecutor improperly impugned his character by attempting to admit evidence that would unfairly prejudice the defendant.  One example pointed to by the defendant, testimony that Glavin had warned McIntyre to watch out for the defendant because he had killed someone, was not before the jury because the judge prohibited the prosecutor from eliciting that hearsay. When, later, Glavin testified that he had told McIntyre to "watch out for the defendant" the judge sustained the defendant's objection.  Although the jury heard the testimony, they had no reason to believe that it was a reference to anything but the stabbing.  The judge also struck McIntyre's reference to seeing the defendant in the lock-up.  The judge found that this was a "very glancing reference" and that it did not specify that it was the defendant rather than McIntyre who was in the lockup.  The judge rejected the defendant's motion for a mistrial and provided the jury with a curative instruction

about testimony in which an objection is sustained or where such testimony has been struck. The judge gave the same instruction in the final charge. The jury is presumed to follow the instructions given by the judge. See Commonwealth v. Roby, 462 Mass. 398, 413 (2012). The testimony challenged by the defendant either was not heard by the jury, was stricken, or was the subject of a curative instruction. There was no error, and in particular, no error that could have affected the verdict.

4. Prosecutor's closing argument. The defendant raises several alleged missteps by the prosecutor in closing argument. Defense counsel did not object during the Commonwealth's closing. The defendant has a considerable burden to demonstrate that an alleged error, or combination of errors, by the prosecutor in closing argument, caused a substantial risk of a miscarriage of justice. See Commonwealth v. Amirault, 424 Mass. 618, 650-652 (1997). "A mere possibility of a different outcome will not satisfy this burden." Id. at 652. If that were the governing standard then virtually, any forceful and enthusiastic remark voiced by a prosecutor would meet that test.

a. The prosecutor began his argument by stating that "[w]hat is most disturbing about this case is . . . that Timothy Shruhan stabbed the wrong man." The defendant asserts that this statement impermissibly asked the jury to put itself into Cahill's position, causing them to think, "[i]t could have been

me."  Because the prosecutor went on to describe the case as "a senseless, stupid stabbing," we perceive nothing in that characterization of the case that suggests to the jury that they should view the case from Cahill's position.

b.  The defendant complains that the prosecutor improperly referred to Cahill's injuries and the heroics of his relatives and friends who came to his aid.  We have already noted that this evidence was admitted without objection and determined that it was not prejudicial to the defendant, particularly in the context of the defense.  In any event, the judge gave a clear instruction to the jury that they were to disregard sympathy and emotion in arriving at a verdict.  We presume that the jury followed the instruction.  See Commonwealth v. McGee, 469 Mass. 1, 12 (2014).

c.  The defendant argues that the prosecutor referred several times to September 11 as an improper appeal to the jury's emotions, asserting that the prosecutor capitalized on a coincidence of timing with the "[fifth] anniversary of the 9/11 terrorist attacks."  He also asserts that the Quencher is a "firefighter hang-out."  This argument appears to be an effort by the defendant to enhance his claim that the entire case was tried improperly through the use of inflammatory evidence.  It was inevitable that the date of September 11 would come up in this trial, after all, it was the date of the crime.  In noting

the date of the crime, the prosecutor referenced September 11 on several occasions. While such repetition was unnecessary and perhaps dramatic, we expect that the jury in this case were able to recognize rhetoric and hyperbole. See Commonwealth v. McLaughlin, 431 Mass. 506, 511-512 (2000). Even if the multiplicity of references to the date was error, it did not create a substantial risk of a miscarriage of justice.

d. The defendant claims that the prosecutor improperly asked the jury to "hold [Shruhan] responsible today," and "to return verdicts of aggravated assault and battery by means of a dangerous weapon." We do not think that these comments may be viewed as impermissible exhortations or, even if error, constituted a substantial risk of a miscarriage of justice. Compare Commonwealth v. Sanchez, 405 Mass. 369, 375-376 (1989).

e. The defendant claims that the prosecutor misrepresented identification evidence by asserting that, in closing argument, the prosecutor stated that Cahill and witnesses O'Keefe and Bianco identified the defendant. There is no merit in this assertion. The prosecutor did not state "unequivocally" or imply that in the aftermath of the stabbing any of the three had identified the defendant.

Conclusion. We have carefully considered all of the alleged errors in the prosecutor's closing in the context of the entire case as it unfolded over the span of five trial days,

including the judge's charge.  In view of the strength of the Commonwealth's case and the judge's repeated warnings to the jury not to decide the case based on sympathy, we conclude that any of the prosecutor's closing remarks, some of which were less than helpful or unnecessary, did not materially influence the jury's verdict.

<u>Judgment affirmed</u>.