NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-952

COMMONWEALTH

vs.

BERNARDINO BARAN-GARCIA.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

On January 19, 2023, after a jury trial in the Boston

Municipal Court, the defendant was convicted of assault by means

of a dangerous weapon, in violation of G. L. c. 265, § 15B (b),

and larceny from a person, in violation of G. L. c. 266,

§ 25 (b).[1]  The defendant now appeals, contending that (1) a

photographic array identification was unduly suggestive; (2) the

motion judge was not impartial during a hearing on a motion to

suppress the photographic array identification; (3) an officer's

testimony at trial contained inadmissible prior consistent

_____

[1] For each charge, the defendant received a sentence of two and one-half years committed to the house of correction to be served concurrently.

statement evidence and hearsay; and (4) the evidence was insufficient to find that the defendant was the person responsible for the assault by means of a dangerous weapon. We affirm.

Background. Given the nature of the defendant's claims, we recite the facts as the jury could have found them in some detail. See Commonwealth v. Kapaia, 490 Mass. 787, 787-788 (2022). The convictions relate to two separate May 28, 2021 incidents that occurred on the same Massachusetts Bay Transit Authority (MBTA) Red Line train within minutes of each other.

1. Larceny from a person. J.J.[2], the victim in the first incident, boarded a Red Line train at the Fields Corner station; the incident occurred shortly thereafter, at around 5:30 P.M., and lasted approximately ten to fifteen minutes. While riding the train, she noticed three people -- two men and one woman -- who had entered the train at the JFK/UMass station and were coming in and out of the train and "constantly" changing seats. J.J. subsequently described one man, who she identified as the defendant, as a "Hispanic male in his 20's wearing a black hoodie and jeans." She described the other man as Hispanic, but older, "in his 40's, maybe or late 30's," and the woman as a

_____

[2] We adopt the convention used by the parties to refer to the victims.

2

"fair skin female, maybe late 20's, early 30's with like kind of orangey hair in a ponytail." The defendant approached J.J., attempted to give her a rose while telling her she looked beautiful, and yelled at her about Jesus and needing to repent. J.J. asked him to leave her alone, but he continued. Finally, one of the defendant's companions, who was some distance away, told J.J. to accept the rose and that the defendant would not do anything and leave her alone if she accepted the flower. As a result, J.J. took the rose in an effort to have the defendant leave her alone. The defendant then went and sat with his two companions.

After the defendant sat down, J.J., using her cell phone, called her boyfriend to tell him that someone was harassing her. While J.J. was on the phone, the defendant came and sat in front of her and when he noticed she was on the phone he asked her who she was calling. After J.J. emphatically told the defendant that she was not calling anyone, the defendant pointed at her and pulled up his hoodie, revealing what J.J. described as "this like huge blade . . . like a machete knife" that was on the defendant's waist, "[l]ike from side to side." J.J. noted that she "couldn't even see the handle because it was so long."

The defendant then looked at J.J. defiantly and asked her for money. When she told him she did not have any money he repeatedly asked her for one dollar. Eventually, she gave him a

3

little leather wallet containing some "European money." The defendant then got up, sat directly next to J.J. while holding the knife, and put his hand on her shoulder. In response, J.J. told him, "I swear to God I don't have any more money," begged him to just let her go, and assured him that she was not going to say anything. The defendant would not leave and instead stood in front of her and asked for her phone, which J.J. also gave to the defendant. After J.J. gave the defendant her phone, the defendant's female companion then came over, stood next to him, and asked J.J. for the password to her phone. As they approached Broadway station, J.J., in tears, pleaded with the two people to let her go, saying that she had a daughter she needed to pick up from school. At the Broadway station, the defendant's male companion, whom J.J. identified as "the older male," joined the defendant and the female companion while J.J, continued to plead to let her go, saying that she had a "a little daughter that is waiting for me to be picked up from school." It was at this point the older male convinced the defendant to return J.J.'s phone to her and told her to "Just go. Just go, please." J.J. then left the train at the Broadway station.

J.J. met with police outside of the Broadway station and described the defendant as a Hispanic male in his twenties

4

wearing a black hoodie and jeans.[3] She also described the other man as Hispanic and older than the defendant.

2. Assault by means of a dangerous weapon. On the same day, approximately fifteen minutes later, at around 5:45 P.M., the victim of the second incident, T.K., boarded the same Red Line train at the Park Street station.[4] Shortly after boarding, she noticed a man lying across a few different seats with "like some backpacks around them." She noted that the man was wearing a black coat with his hood up, a black mask, and "a neon backpack, like, a drawstring type bag" near him. A bystander also noted the man lying on the seats and testified that there were "two people directly across from him that seemed to know him." He also testified that the man lying on the seats was wearing multiple coats, that "[o]ne of them may have been black, and one of them may have been yellow," but acknowledged that he was not sure, and that the man was wearing "work boots" or "beat up shoes." He also recalled that the man had "quite a few items with him," including a series of reusable shopping bags. The

_____

[3] As discussed in more detail below, J.J. later identified a photograph of the defendant from a photographic array as the person who attacked her on the train.

[4] The Park Street station is three stops after the Broadway station, where J.J. left the train.

5

bystander also testified that he thought the other man was wearing a gray sweatshirt.

Approximately thirty seconds after T.K. boarded the train, while she was on her phone, the same man who had been lying down across the seats approached her and said, "Give me your money." T.K. told the man that she did not have any money. The man then repeated his demand, "Give me your money" more aggressively and opened his jacket, revealing what T.K. described as "a really big knife." Again T.K. told him, "I don't have any money". The bystander testified that he heard T.K. tell the man to get away from her and saw the man who had been lying down "leaning, almost lurching over her." A woman sitting next to T.K. also saw the knife and pushed T.K. across the train car where there were more people. This woman then sat down with T.K. The bystander testified that T.K. appeared scared, "like very curled up and she was -- she was shaking." While sitting on the other side of the train, T.K. tried to make herself "not too visible and not too . . . noticeable" because she did not want the man to realize that she was still on the train.

T.K. wanted to leave the train but was afraid because the man was near the train's door. However, other passengers then stood up so that the man would not be able to see T.K. T.K. then left the train at the Charles/MGH station, one stop away from where she had boarded, and had no further interaction with

6

the man who showed her the knife and demanded her money. After leaving the train, T.K. spoke with the train conductor, who said that he would call the police to come to the Kendall/MIT station, the next stop after the Charles/MGH station. T.K. reboarded the train, which waited in a tunnel for around ten minutes for the police to arrive at the Kendall/MIT station.

An MBTA Transit Police officer who subsequently participated in the defendant's arrest, Officer Harer, was dispatched to the Kendall/MIT station around 6 P.M. He arrived while two other officers, Officer Sans and Sergeant Rutledge, were removing a man who Officer Harer identified as the defendant from the train. Officer Harer testified that the defendant was a Hispanic man who looked to be in his twenties and was wearing a dark coat, blue jeans, and dark-colored sneakers, but did not recall if he was wearing a face mask. When Officer Harer arrived, Officer Sans was already holding a large kitchen knife, so Officer Harer assisted Sergeant Rutledge with placing the defendant in custody. Officer Harer read from a police report at trial that stated that "[w]hen Officer Sans searched the man's waistband area, he discovered a large kitchen knife with a black handle tucked into the front of the waistband."[5] Officer Harer testified that the knife was a four

_____

[5] Officer Sans did not appear at trial because he no longer worked for the MBTA Transit Police.

7

to six inch long kitchen knife.  The police recovered a second knife from William Orellana, a thirty-eight year old man who police initially identified as a suspect,[6] when he attempted to discard it.  The police seized both knives, but neither was entered in evidence at trial.  After placing the defendant in custody, Officer Sans and Sergeant Rutledge continued investigating the incident while Officer Harer remained with the defendant.

After T.K. arrived at the Kendall/MIT station, she spoke with the police and described the man with the knife on the train as "someone with like a black jacket and a black mask, their hood was up, they had this backpack, and I think even a bag with white sneakers."  The police returned and told T.K. that there were two people who matched the description she gave and who both had knives.  The police showed both knives to T.K., and she said it was "very obvious which knife it was."  T.K. testified that the knife was "almost kind of like a chef's knife, like it was a really big kind of knife you'd use to cut a potato with," and "like a really big blade with a black handle."  She further testified that it was "like an inch and a half to

---

[6] Police detained the defendant, Orellana, and Allison Sullivan as suspects at the Kendall/MIT station after the incident.

two inches wide and . . . quite long," and "like six to nine inches long, and it had a black handle."

T.K. then left the train to answer a police officer's questions. While answering questions, she saw that there was, with police officers, a man on the ground who she recognized as the person who had attacked her. The bystander, who had walked off the train at the Charles/MGH station and boarded the next train traveling in the same direction, testified that as the train approached what he believed was the Kendall/MIT station, he saw the man who attacked T.K. laying down on the ground. He also saw that an officer standing next to the assailant was holding a "silver . . . kitchen" knife that "was just kind of like cartoonish in proportion."

On July 19, 2021, T.K. participated in a photographic array identification but declined to identify anyone as the person who attacked her because she "just didn't feel like [she] had seen his face well enough during the interaction" as she had been "looking at the knife most of the time," and the man had been wearing a mask and a hood.[7] At trial, both T.K. and the

---

[7] The bystander also declined to participate in a photographic array because the identification procedure was at the police station, and he did not want to leave his wife alone when she had given birth to his first child two days before.

9

bystander testified that they could not say with certainty that the defendant was the person who attacked T.K.

Discussion. 1. The photographic array. The defendant first argues that his motion to suppress the out-of-court identification by photographic array should have been allowed. An out-of-court eyewitness identification arising from a police identification procedure is not admissible "if the defendant proves by a preponderance of the evidence that the identification was 'so unnecessarily suggestive and conducive to irreparable misidentification that its admission would deprive the defendant of his right to due process.'" Commonwealth v. Johnson, 473 Mass. 594, 597 (2016), quoting Commonwealth v. Walker, 460 Mass. 590, 599 (2011). "[T]he judge must examine the totality of the circumstances attending the confrontation to determine whether it was unnecessarily suggestive" (quotation and citation omitted). Johnson, supra. We accept the judge's subsidiary findings based partly or wholly on oral testimony unless clearly erroneous but independently review documentary evidence (such as photographs) and the judge's ultimate findings and conclusions of law. Commonwealth v. Ploude, 101 Mass. App. Ct. 845, 850 (2022).

Here, on July 16, 2021, J.J. identified the defendant from a photographic array. The defendant contends J.J.'s photographic array identification was unnecessarily suggestive,

10

highlighting (1) that the photograph of the defendant was labeled "Page #:  7 of 8" but was the last photograph in the array when submitted in evidence at the motion to suppress hearing, and (2) six of the seven "filler" photographs had features that distinguished the subjects of the photographs from the defendant.  We disagree.

To begin, we note that the officer who created the photographic array testified that she used a system that provides photographs of people whose features match the characteristics that have been entered in to a database.  She also testified that, in selecting photographs for the array, she chose photographs of people with characteristics similar to the defendant.

Additionally, the officer who administered the photographic array to J.J. (presenter) did not know who the defendant was prior to administering the array.  He further testified that prior to showing J.J. the array he read a list of instructions to her designed to reduce suggestiveness, including that she should not feel compelled to make an identification as the person who committed the crime may or may not be included in the array.

While the defendant's photograph was sequentially out of order when the Commonwealth introduced it in evidence at the motion to suppress hearing, there is no further evidence that

11

the presenter showed it to J.J. out of numerical order.[8]  In any event, the label "Page #:  7 of 8" is written in a small font size in the corner of the page, such that the label would be easily overlooked.

We also do not view the "filler" photographs' features that the defendant highlighted to be so distinct as to be unnecessarily suggestive.[9]  See Johnson, 473 Mass. at 597.  Two of the subjects of the photographs have "light beards," two have "five o'clock shadows," one has facial scarring, and one appears to be noticeably younger than the others.  However, all of the subjects match J.J.'s description of the defendant, and the officer who administered the photographic array instructed J.J. that "[p]eople may not appear exactly as they did at the time of the event because features such as clothing, hair, [and] facial hair are subject to change."[10]  We therefore do not view the identification procedure to have been unnecessarily suggestive. See Johnson, supra.

_____

[8] The presenter testified that he did not know when the defendant's photograph was placed out of order in the array.

[9] As detailed in his reply brief, the defendant has withdrawn his contention that the motion judge erred in finding that two, rather than four, of the photographs in the array showed people with facial hair.

[10] In fact, while J.J. described the defendant as wearing a black hoodie, the only subject wearing a black hoodie in the photographic array was a person other than the defendant.

12

2.  The motion judge's questions.  For the first time on appeal, the defendant argues that the motion judge improperly "usurped the prosecutor's role and elicited substantial testimony that otherwise would not have been elicited."  Because the defendant did not object to the judge's questioning at trial, we review the defendant's claim of judicial bias for whether the judge's questioning created a substantial risk of a miscarriage of justice.  See Commonwealth v. Proia, 92 Mass. App. Ct. 824, 836 (2018) (defendant's unpreserved claim that judge did not act as "impartial arbiter" during jury empanelment reviewed for whether judge's comments created substantial risk of miscarriage of justice).  "To decide whether an error creates a substantial risk of a miscarriage justice, we must determine 'if we have a serious doubt whether the result of the trial might have been different had the error not been made.'" Commonwealth v. Desiderio, 491 Mass. 809, 810 (2023), quoting Commonwealth v. Azar, 435 Mass. 675, 687 (2002), S.C., 444 Mass. 72 (2005).

Here, the motion judge's questions were appropriately limited, primarily asking for elaboration on or clarification of testimony that the prosecutor had already elicited.  See Commonwealth v. Lucien, 440 Mass. 658, 664 (2004) ("A judge may properly participate in the questioning of a witness so long as the questioning is not partisan in nature").  For example, the

13

motion judge asked the officer who created the photographic array to explain what a "blind presenter" was after the officer testified that a blind presenter administers the identification procedure. The judge also queried which specific advisements the officer administering the identification procedure gave to T.K. after the officer testified that he read written instructions to T.K. prior to presenting the array to T.K.

Given the totality of the circumstances, and because the photographic array was not unnecessarily suggestive, we are not persuaded that a substantial risk of a miscarriage of justice has occurred. See Desiderio, 491 Mass. at 810.

3. Officer Mohler-Faria's testimony. At trial, Officer Mohler-Faria recounted J.J.'s report of the first incident, given after she departed the train at the Broadway station. The defendant contends, and the Commonwealth concedes, that it was error to allow Officer Mohler-Faria to testify to J.J.'s out-of-court statements. See Commonwealth v. Novo, 449 Mass. 84, 93 (2007), quoting Commonwealth v. Tennison, 440 Mass. 553, 563 (2003) ("A witness's prior statement that is consistent with that witness's trial testimony is usually inadmissible"). Nevertheless, the defendant acknowledges that he did not object to Officer Mohler-Faria's testimony at trial. Accordingly, we review for whether the testimony's admission, if erroneous, created a substantial risk of a miscarriage of justice. See

14

Commonwealth v. Shruhan, 89 Mass. App. Ct. 320, 325 (2016). Assuming without deciding that the admission of Officer Mohler-Faria's testimony was erroneous, we conclude that its admission did not create a substantial risk of a miscarriage of justice. See id.

The reported description of the defendant that Officer Mohler-Faria received was vague, stating only that the defendant was a man in his mid-twenties wearing jeans and a black sweatshirt, and did not mention his ethnicity.[11] Notably, Officer Mohler-Faria's testimony was also cumulative of J.J.'s testimony about the defendant's description, and further J.J. identified the defendant in court. See Commonwealth v. Wilson, 427 Mass. 336, 348 (1998) (improperly admitted hearsay evidence of defendant's hostility not prejudicial because it was "merely cumulative of properly admitted evidence"). Accordingly, Officer Mohler-Faria's testimony did not create a substantial risk of a miscarriage of justice. See Shruhan, 89 Mass. App. Ct. at 325.

---

[11] In fact, rather than simply restating J.J.'s testimony, Officer Mohler-Faria's testimony differed slightly. J.J. testified that she eventually took the rose that the defendant offered, but Officer Mohler-Faria testified that "[w]hen [J.J.] didn't accept the rose, she stated the male had a knife and demanded money from her."

15

4. The defendant's motion for a required finding of not guilty. We review the denial of a motion for a required finding of not guilty for whether "the evidence introduced up to the time the Commonwealth rested its case to determine whether the evidence, viewed in the light most favorable to the Commonwealth, was sufficient for a reasonable jury to infer the existence of each essential element of the crime charged, beyond a reasonable doubt." Commonwealth v. Rivera, 460 Mass. 139, 141 (2011). Identification of the defendant "is a key element in every criminal trial, and the absence of identification has always been a basis requiring acquittal." Commonwealth v. Koney, 421 Mass. 295, 302 (1995).

Here, the defendant contends that the Commonwealth failed to prove that the defendant was responsible for the assault by means of a dangerous weapon incident against T.K. To support his contention, the defendant highlights the fact that neither T.K. nor the bystander identified the defendant as the person responsible for the offense. He also highlights the fact that T.K. testified that the police identified two men at the Kendall/MIT station who matched her description of the defendant and who both had knives. We are not persuaded.

Contrary to the defendant's contention that the evidence equally supports two inconsistent propositions -- that either the defendant committed the offense or the defendant's companion

16

found with a knife committed the offense -- the evidence presented to the jury, and the Commonwealth's theory, consistently identified the defendant as the one who committed the offense.  See Commonwealth v. Lodge, 431 Mass. 461, 465 (2000) ("circumstantial evidence is competent to establish guilt beyond a reasonable doubt").

J.J. described the defendant as a Hispanic man in his twenties wearing a dark hoodie and jeans.  She then identified the defendant as her assailant from a photographic array.  T.K. also described the perpetrator of the second assault as wearing a black coat with his hood up.  Officer Harer described the defendant as a Hispanic man wearing a dark coat, blue jeans, and dark-colored sneakers.  While the bystander was uncertain at trial that the perpetrator of the second incident was wearing multiple coats, one of which may have been black and one which may have been yellow, he described the perpetrator's male companion as wearing a gray sweatshirt.  As a result, the jury reasonably could have concluded that, based on the consistent trial descriptions of the defendant as a Hispanic man in his twenties wearing a dark top and jeans, all four witnesses were describing the same man -- the defendant.  See Rivera, 460 Mass. at 141.  Although the police at the Kendall/MIT station told T.K. that two people they had detained matched her description, the defendant and Orellana, the bystander testified that the

17

second man was wearing a gray sweatshirt, which was inconsistent with any description of the perpetrators of the assaults.

Though the defendant suggests that J.J.'s descriptions of the knife as "huge" and "like a machete" are inconsistent with T.K.'s description of the knife, we disagree.  A knife that one witness describes as "huge" and "like a machete" could reasonably be described by another as "a really big knife."  See Commonwealth v. Sabin, 104 Mass. App. Ct. 303, 305 (2024) ("The inferences that support a conviction need only be reasonable and possible; [they] need not be necessary or inescapable" [quotation and citation omitted]).

More importantly, T.K.'s description of the knife -- "kind of like a chef's knife" with a black handle and a blade that was six to nine inches long -- squares with Officer Harer's and Officer Sans's descriptions of the knife that Officer Sans confiscated from the defendant.  As noted at trial, Officer Sans's report described the knife as "a large kitchen knife with a black handle," and Officer Harer described the knife as a kitchen knife that was four to six inches long.  Indeed, T.K.'s statement that "it was very obvious which knife it was" suggests, despite the absence of a description of the second knife, that the knives were distinct enough in appearance that the second knife would not have matched any of the witness descriptions of the knife used to assault T.K.

18

In the end, both victims testified to similar crimes occurring minutes apart on the same train. And both victims testified to a man exhibiting erratic behavior who demanded money and revealed a large knife concealed in his clothing.

In light of the similar descriptions of the man's appearance, the knife used in the attacks, the similar behavior between the two incidents, and the fact that the incidents occurred close in time, the jury had sufficient evidence to conclude beyond a reasonable doubt that the defendant was responsible for the second incident. See Rivera, 460 Mass. at 141; Lodge, 431 Mass. at 465.

Judgments affirmed.

By the Court (Meade,
  Desmond & Wood, JJ.[12]),

Clerk

Entered: May 20, 2026.

---

[12] The panelists are listed in order of seniority.